UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| Dakotans for Health, Rick Weiland, and | ) | |
| and Adam Weiland, | ) | |
| | ) | |
|      Plaintiffs, | ) | Civ. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| Leah Anderson, Minnehaha County | ) | |
| Auditor, sued in her official capacity, and | ) | |
| Jean Bender, Dean Karsky, Gerald Beninga, | ) | |
| Jen Bleyenberg, and Joe Kippley, | ) | |
| Minnehaha County Commissioners, all | ) | |
| sued in their official capacities, | ) | |
| | ) | |
|      Defendants. | ) | |
| _____ | ) | |

**Memorandum in Support of**
**Motion for Temporary Restraining Order**
**Restraining Defendants from Enforcing or Threatening to Enforce**
**<u>Their New Petition Circulation Prohibitions</u>**

**Table of Contents**

I.      Statement of facts                                                          3

II.     Argument                                                                    9

        A.      The new policy unconstitutionally bans core political speech    9
                in almost all public places

        B.      The new policy is an unconstitutionally vague, standardless,    13
                prior restraint of core political speech

        C.      The new policy unconstitutionally requires pre-registration of  16
                petition circulators and other political speakers

III.    All *Dataphase* factors favor issuance of a temporary restraining order   19

        A.      Without a temporary restraining order, plaintiffs face          20
                irreparable harm: loss of their First Amendment rights and
                impairment of their ability to collect enough valid signatures to
                qualify the *Roe v. Wade* and state sales tax on food initiatives for
                the ballot

        B.      The threat of irreparable harm outweighs any possible injury    22
                to defendants

        C.      Plaintiffs are likely to prevail on the merits                  22

        D.      The public interest favors a temporary restraining order        23

        E.      Summary of *Dataphase* factors                                  23

IV.     Bond should be waived                                                       23

V.      Conclusion                                                                  24

"[I]t is our law and our tradition that more speech, not less, is the governing rule." *Citizens United v. FEC*, 558 U.S. 310, 361 (2010).

------------------------------

## I.    Statement of facts

Rick and Adam Weiland manage Dakotans for Health, a South Dakota ballot question committee and healthcare advocacy network.  They seek political change by circulating petitions to place initiated measures on the ballot.  They use volunteer and paid circulators to try to place on the November 2024 ballot initiated measures that would allow the people of South Dakota to restore their *Roe v. Wade* rights, and to eliminate the state sales tax on food.  Declaration of Rick Weiland ¶¶ 1-5.

On May 2, 2023, at the request of Auditor Leah Anderson, the Minnehaha County Commission enacted a new policy severely limiting petition circulation and other political speech at the Minnehaha County Courthouse and Administration Building.  A copy of the new policy is attached to the Declaration of Cory Heidelberger as Exhibit 1.  The new policy bans petition collection and political speech everywhere around the Minnehaha County Courthouse and Administration Building except in two small rectangular areas, one southeast of the main entrance to the Courthouse, the other at least 50 feet to the west of the west entrance to the

Administration Building.  The two areas in which petition circulation and political speech are still allowed are shown on Exhibits 3 and 4 attached to Heidelberger's Declaration.  Under the new policy, petition circulation and political speech are banned in 99.3% of the space in which they were allowed until May 2.  Heidelberger Declaration ¶¶ 8-16.

Minnehaha County is by far South Dakota's most populous county.  Petition circulators have traditionally sought signatures to qualify petitions for the ballot at the Minnehaha County Courthouse and Administration Building. Plaintiffs' petition circulators seek signatures there.  Declaration of Rick Weiland ¶¶  6-9.  The Minnehaha County petition circulation policy that defendants abolished on May 2 recognized that "Minnehaha County buildings, particularly the Administration Building, have traditionally been popular locations for citizens collecting signatures for ballot petitions."  Heidelberger Declaration Exhibit 2.

Heidelberger has extensive petition circulation experience.  Declaration ¶¶ 2-6.  Based on his experience, he states in the following numbered paragraphs of his Declaration:

"17.    In my opinion, as a matter of fact, and without regard to whatever legal rules may or may not apply, neither of the small rectangular areas is an adequate

4

location from which petition circulators can solicit petition signatures, especially when compared with all the areas in which such solicitation is prohibited.

"18.   Both small rectangular areas are located in areas that voters walk around—not through or directly past—thereby making them ineffective places from which to solicit petition signatures.

"19.   The most effective place from which to solicit a petition signature is from a location that a potential voter will walk through or directly past.  By confining petition circulators to the two small rectangular areas, circulators can no longer place themselves in such a location.  If a petition circulator is confined to those areas, the circulator will be significantly less effective.  It is unlikely that many potential voters will depart from their intended paths to come over to one of the rectangles to find out what is going on there.  And unless that happens, the interactive political communication that is essential to obtaining a voter's signature on a petition cannot even begin.

"20.   The small rectangular areas keep petition circulators far enough away from most passersby that circulators will not be able to get the attention of or communicate with most passersby in a normal conversational tone of voice.  Circulators will have to shout, which is less inviting than a normal conversational

5

volume and tone.  Voters who might accept a conversationally offered invitation to discuss and possibly sign a petition will be turned off by a shout, and will continue walking instead of coming over to discuss the petition and possibly sign it.

"21.   Confining petition circulators to the two small rectangular areas makes successful petition circulation harder in another way: both locations require circulators and any voters who stop to discuss an issue to be closer to the flow of automobile traffic.  Being closer to the flow of traffic causes more noise, distraction, and physical risk to circulators, and to potentially interested voters, than the locations traditionally used by circulators.

"22.   Both small rectangular areas require circulators to remain in the sun and out of the shade on hot summer days, and in the rain, wind, and snow on other days, and require people who wish to engage and discuss with a circulator, read a petition, and perhaps sign it, to do the same.

"23.   All of this makes it less likely that circulators will want to solicit or be successful in soliciting signatures, or that voters will want to pause their activity, engage and discuss with a circulator, and perhaps sign a petition.

"24.   Defendants' limitation of petition circulation to the two small rectangular areas requires all petition circulators to congregate in those small areas

6

and thereby creates a congested area full of petition circulators that makes it less likely that any citizen will stop and engage with a petition circulator.

"25.    Defendants' limitation of petition circulation and opponents to the two small rectangular areas necessarily confines *Roe v. Wade* petition circulators and opponents to the same small space, and thereby limits circulators' ability to move away from opponents.  And it necessarily confines all other petition circulators, such as the petition circulators who seek to repeal the state sales tax on food, to the same small space, and thereby makes it less likely that a citizen will engage with them or sign their petition.

"26.    Petition circulation requires encountering potential signers, discussing a political issue with them, and attempting to persuade them to sign a petition, all of which defendants' new policy makes significantly harder.

"27.    Everything that makes petition circulation harder makes it more costly, and makes it less likely that a particular petition will receive enough signatures to qualify for the ballot, and thereby to give voters a chance to accept or reject it."

In addition, the new policy allows Auditor Leah Anderson to limit how many circulators and opponents may use the two small rectangular areas at one time, thereby prohibiting speech before it can occur.  Heidelberger Declaration, Exhibit

1 p. 2 ("Due to limited space and safety concerns within the Designated Areas, all Utilizers must check-in at the Minnehaha County Auditor's office prior to conducting any Political Activity on the Minnehaha County campus to permit the placement of safety markers *and to verify space availability within the Designated Areas.*") (emphasis added). The new policy contains no standards, rules, or guidelines that regulate how Auditor Anderson may exercise her new authority.

And the new policy prohibits all petition circulators and other political speakers from engaging in political activity, including core political speech, unless they pre-register at the Auditor's office. Declaration of Cory Heidelberger, Exhibit 1 page 2 (petition circulators and political speakers "must check-in at the Minnehaha County Auditor's office prior to conducting any Political Activity[.]") Pre-registration requires a circulator to disclose her identity, as well as whatever other unspecified information the Auditor may require, such as home address, date of birth, telephone number, and email address. All such records would be open to the public.

II.     **Argument**

A.      **The new policy unconstitutionally bans core political speech in almost all public places**

"'Public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'  In such places, the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'"  *United States v. Grace*, 461 U.S. 171, 177 (1983) (citations omitted).  A ban on the display of signs, banners, or other such devices on the sidewalks surrounding the Supreme Court was unconstitutional, and could not be justified as a time, place, and manner regulation.  *Id.*, 461 U.S. at 183.  Indeed, "'time out of mind' public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988), quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939).

The First Amendment problem here goes even beyond ordinary political speech, because it extends to, and targets, petition circulation.  Defendant Anderson

told defendant county commissioners that the reason for the new policy is that "We've witnessed an increase in activity with those collecting signatures, but also those who wish to share a message of opposition[.]" Declaration of Rick Weiland, ¶ 12 and Exhibit 1.  But "[p]etition circulation . . . is 'core political speech,' because it involves 'interactive communication concerning political change.'   First Amendment protection for such interaction . . . is 'at its zenith.'"  *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 186-87 (1999) (internal citations omitted), quoting *Meyer v. Grant*, *supra*, 486 U.S. at 422, 425.  Plaintiffs' right to engage in such activity "is at the core of the First Amendment, and the right to petition for a redress of grievances is among the most precious of liberties."  *Calzone v. Summers*, 942 F.3d 415, 422 (8th Cir. 2019) (*en banc*) (cleaned up).

Defendants' new policy bans all political speech, including the core political speech of petition circulation, on all sidewalks at the Minnehaha County Courthouse and Administration Building.  This includes the sidewalk in front of the Courthouse, and the sidewalk and walkway on both sides of the Administration Building. Declaration of Cory Heidelberger, Exhibits 3 and 4.  Under *United States v. Grace*, *supra*, and *Frisby v. Schultz*, *supra*, these sidewalks are public forums.  Defendants admit that "Minnehaha County buildings, particularly the Administration Building,

have traditionally been popular locations for citizens collecting signatures for ballot petitions." Declaration of Cory Heidelberger, Exhibit 2.

Because the new policy bans core political speech, strict scrutiny applies. The Eighth Circuit has said that this argument "may have merit," but has not decided it. *Dakotans for Health v. Noem*, 52 F.4th 381, 389 (2022). Similarly, in *Calzone v. Summers,* 942 F.3d 415, 423 n.6 (8th Cir. 2019) (en banc), the court "believed some authority supported applying strict scrutiny to the law requiring the public disclosure of lobbying activities, but it declined to decide which standard governed because the law as applied to the plaintiff failed exacting scrutiny." *Dakotans for Health v. Noem*, 543 F. Supp. 3d 769, 783 (D.S.D. 2021).

Besides failing strict scrutiny, the new prohibition fails to meet the "narrowly tailored to serve a significant government interest" standard. "Narrow tailoring is crucial where First Amendment activity is chilled–even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Ams. for Prosperity Found v. Bonta*, ___ U.S. ___,141 S. Ct. 2373, 2384 (2021), quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Defendants' own statements establish that they cannot meet the "narrowly tailored to serve a significant government interest" standard. Defendant Anderson's

May 2, 2023, memo to the Minnehaha County Commissioners cites a desire to "have better control over where these [First Amendment] activities can take place on our campus." Declaration of Cory Heidelberger, Exhibit 1. But government has no legitimate interest in controlling political speech. The same memo cites an unspecific "vestibule area" and an unspecified "traffic flow problem," but fails to explain how core political speech in a public forum, including sidewalks, has caused any "traffic flow problem," let alone one so insurmountable that it could possibly justify the new prohibition. And the memo says that "county buildings must accommodate many people every day without any unnecessary delay or inconvenience," but again fails to identify what "unnecessary delay or inconvenience" has occurred, or how it even theoretically could require such a drastic remedy as forbidding all political speech on all sidewalks and in virtually all public areas around both buildings.

The new policy, by confining circulators to two small, out-of-the-way areas, makes obtaining signatures on a petition much harder. Declaration of Cory Heidelberger ¶¶ 17-27. This critically impedes obtaining signatures on a petition, because petition circulation requires encountering potential signers, discussing a political issue with them, and attempting to persuade them to sign a petition, all of

which defendants' new policy makes significantly harder. "Petition circulation is the less fleeting encounter [than handbill distribution], for the circulator must endeavor to persuade electors to sign the petition. That endeavor, we observed in *Meyer* [*v. Grant*, 486 U.S. 414, 421 (1988), of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Buckley v. Am. Const. L. Found.*, 525 U.S. 182, 199 (1999) (cleaned up).

**B.    The new policy is an unconstitutionally vague, standardless, prior restraint of core political speech**

The new policy authorizes defendant Anderson—after having confined petition circulators and others who want to exercise their First Amendment rights to two small rectangular areas—to prohibit and restrain core political speech, merely on the basis of her subjective, standardless, unreviewable choice, based on the "limited space" and "safety concerns" that defendants themselves created by limiting political speech to those two small rectangular areas.

"Due to limited space [the two new rectangular areas to which petition circulators and others are confined] and safety concerns within the Designated Areas, all Utilizers must check-in at the Minnehaha County Auditor's office prior to conducting any Political Activity on the Minnehaha County campus to permit the

placement of safety markers *and to verify space availability within the Designated Areas."*
(emphasis added).  Declaration of Cory Heidelberger, Exhibit 1 p. 2.  So if Anderson
believes, or even claims, that "space availability" is lacking or that there are "safety
concerns" or insufficient "space availability" in the new small rectangular "free-
speech" areas, she can prohibit any further use of those small spaces.  And she can
warn the public about the "free speech" areas by placing "safety markers" around
them.  The new policy lacks any rules, standards,  or guidelines by which she is to
exercise her untrammeled power to prohibit political speech in the two small areas.

Prior restraint of speech is unconstitutional in all but the most extraordinary
circumstances.  *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) ("'Any system
of prior restraints of expression comes to this Court bearing a heavy presumption
against its constitutional validity.'  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70
(1963); see also *Near v. Minnesota*, 283 U.S. 697 (1931).  The Government 'thus carries
a heavy burden of showing justification for the imposition of such a restraint.'
*Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).")  The government's
inability to restrain publication of the Pentagon Papers during wartime
demonstrates beyond doubt that defendants may not restrain the peaceful exercise
of First Amendment freedoms during peacetime.

14

Notably, *N. Y. Times Co. v. United States* did not rely on a "strict scrutiny" analysis. So the burden the government must meet to justify a prior restraint of speech is even higher than strict scrutiny. In other contexts, laws that burden political speech are subject to strict scrutiny. "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people. [citation omitted] The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). Accordingly, "political speech must prevail against laws that would suppress it, whether by design or inadvertence." *Id.* at 340. So "[l]aws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* (internal quotations omitted). For the reasons discussed above, the new policy does not pass any scrutiny, let alone strict scrutiny.

In addition, the new policy allowing defendant Anderson to prohibit speech on a case-by-case basis lacks any standards or rules that would limit in any way her unfettered discretion. A law must "provide explicit standards for those who apply" it. *Dakota Rural Action v. Noem*, 416 F. Supp. 3d 874, 889 (D.S.D. 2019). A complete

15

lack of standards allows government officials to use a law to enforce their personal preferences. But government officials are not allowed unrestrained authority to prohibit speech.

### C.   The new policy unconstitutionally requires pre-registration of petition circulators and other political speakers

The new policy requires all petition circulators, and others who wish to exercise their First Amendment rights, to pre-register at defendant Anderson's office. Declaration of Cory Heidelberger, Exhibit 1, p. 2. In order to pre-register, a person must disclose her identify, and all other information Anderson may choose to require, such as home address, telephone number, email address, and date of birth.

The right to engage in anonymous speech is central to American history and the First Amendment. The Federalist Papers were published anonymously. https://guides.loc.gov/federalist-essays-in-historic-newspapers/authors (last visited May 8, 2023). Indeed, "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind." *Talley v. California*, 362 U.S. 60, 64 (1960) (invalidating a city ordinance prohibiting anonymous leafletting).

16

"Under our Constitution, anonymous pamphelterring is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995), citing John Stuart Mill, On Liberty and Considerations of Representative Government, 1, 3-4 (R. McCallum ed. 1947). Anonymous speech "exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular[.]" *Id.*  Anonymity may cause "unpalatable consequences," but "our society accords greater weight to the value of free speech than to the dangers of its misuse." *Id.*  The protection for such speech "extend[s] equally to issue-based elections" such as a school tax referendum, *id.* at 347—and petition campaigns in South Dakota in 2023 seeking to restore abortion rights and eliminate a nationally anomalous state sales tax on food.

The new policy, by requiring pre-registration with government as a precondition of the right to engage in political speech, unconstitutionally prohibits anonymous speech.  *Calzone v. Summers*, 942 F.3d 415 (8th Cir. 2019) (en banc) (Missouri may not require unpaid lobbyist who spends no money to register or pay a fee).  Losing anonymity exposes a person "to retaliation for his advocacy."  *Id.* at 423 (cleaned up).

Efforts to compel South Dakota petition circulators to identify themselves and pre-register with the government have fared poorly.  *SD Voice v. Noem*, 432 F. Supp. 3d 991, 1002 (D.S.D. 2020) (House Bill 1094's requirements that petition circulators disclose their names and personal information "place serious and draconian burdens on protected speech" and violate the First Amendment), *appeal dismissed as moot*, 987 F.3d 1186.  *Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022) (affirming preliminary injunction against enforcement of House Bill 1094's successor, Senate Bill 180, that required paid petition circulators to disclose the same information, and stating that SB 180  "effectively thumbs its nose at both *Meyer* [*v. Grant*, 486 U.S.  414 (1988)] and *Buckley* [*v. Am. Const. Law Found.*, 525 U.S. 182 (1999)]."

*SD Voice v. Noem* and *Dakotans for Health v. Noem* establish that defendants cannot require petition circulators to disclose their names or other identifying information as a precondition to being allowed to exercise their First Amendment rights.  Minnehaha County's new policy unconstitutionally requires pre-speech disclosure of every petitioner's and speaker's identity.

18

III.   **All *Dataphase* factors favor issuance of a temporary restraining order**

"[T]he standards for issuing either a temporary restraining order or a preliminary injunction in this circuit are set out in the seminal decision of *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 & n.5 (8th Cir. 1981) (en banc)." *United States v. Barnes*, 912 F. Supp. 1187, 1192 (N.D. Iowa 1996).  The *Dataphase* factors are: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020).

If the moving party seeks a preliminary injunction against implementing a state statute, it must show that it "is likely to prevail on the merits."  *Dakota Rural Action v. Noem*, 416 F. Supp. 3d 874, 892 (D.S.D. 2019), quoting  *Planned Parenthood Minn., N.D., S.D. v. Rounds*,  530 F.3d 724, 731-32 (8th Cir. 2008) (*en banc*).  But no state statute is at issue here, so this higher standard does not apply.  And plaintiffs notified defendants of their application for a temporary restraining order, so the provisions of F.R.Civ.P. 65 concerning temporary restraining orders granted without notice do not apply.

19

A.    **Without a temporary restraining order, plaintiffs face irreparable harm: loss of their First Amendment rights and impairment of their ability to collect enough valid signatures to qualify the *Roe v. Wade* and state sales tax on food initiatives for the ballot**

Plaintiffs are trying to obtain enough signatures to place on the November 2024 ballot a constitutional amendment to incorporate *Roe v. Wade* into the South Dakota Constitution, and an initiated law to remove South Dakota's sales tax on food. Declaration of Rick Weiland ¶¶ 4-5. They must collect 35,017 valid signatures for the constitutional amendment and 17,509 signatures for the initiated law. Declaration of Rick Weiland ¶ 6. The new policy makes those tasks significantly harder. Declaration of Cory Heidelberger ¶¶ 17-27.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Generally, "[i]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 914-15 (8th Cir. 2015), quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Plaintiffs' injuries cannot be compensated with damages, so they have no adequate remedy at law. *Dakotans for Health v. Noem*, 543

F. Supp. 3d 769, 793 (D.S.D. 2021) ("Plaintiff would not be able to sue Defendants for monetary damages, so any injury to Plaintiff is irreparable.")  So plaintiffs face irreparable harm.

In *Dakota Rural Action v. Noem*, *supra*, 416 F. Supp. 3d at 892, this Court found the threat of irreparable harm to the movants "clear and substantial," because "planning and seeking public support, must take place now, before and in anticipation of the next construction season."  Likewise, the threat of irreparable harm to DFH is "clear and substantial," because the large number of signatures needed to place *Roe v. Wade* and the state sales tax on food on the ballot must be collected now, with all due by May 7, 2024.  Senate Bill 113 (2023), available at https://sdlegislature.gov/Session/Bill/24118 (last visited May 9, 2023).

**B.     The threat of irreparable harm outweighs any possible injury to defendants**

Defendants admit that "Minnehaha County buildings, particularly the Administration Building, have traditionally been popular locations for citizens collecting signatures for ballot petitions."  Declaration of Cory Heidelberger, Exhibit 2.  A temporary restraining order will allow petition circulation and political speech at the Minnehaha County Courthouse and Administration Building to return to how

it was before defendants adopted their new policy.  Defendants face no potential injury.  So the threat of irreparable harm to DFH outweighs any potential injury to defendants.  *Groene v. Seng*, 2006 U.S. Dist. Lexis 45174, * 12, 2006 WL 5680261 (D. Neb.) (plaintiffs' loss of their First Amendment right to circulate a petition seeking to change Nebraska's constitution outweighs defendants' inability to arrest petition circulators during the pendency of the case).

### C.     Plaintiffs are likely to prevail on the merits

Section II of this brief shows that defendants' new policy violates the First Amendment.  This by itself justifies a temporary restraining order.  "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied."  *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012), quoting *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam).

### D.     The public interest favors a temporary restraining order

"[F]reedom of speech and association are constitutional rights that are central to all citizens of our country."  *Dakota Rural Action v. Noem*, 416 F. Supp. 3d at 893 (D.S.D. 2019).  In this case, as in *Dakota Rural Action*, "[t]hose rights will be

thwarted" if defendants' unconstitutional policy remains in effect, so public policy favors plaintiffs.  *Id.*

### E.  Summary of *Dataphase* factors

All *Dataphase* factors favor issuing a temporary restraining order.  No equities weigh against it.

## IV.  Bond should be waived

Under F.R.Civ.P. 65(c), "The court may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  No bond should be required here.  As discussed in Section III.B. above, a temporary restraining order will not cause defendants to sustain any costs or damages.  Even if defendants could somehow show that they could sustain costs or damages, this litigation seeks to vindicate the vital public interest in the First Amendment, so a bond should be waived.  *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (district court did not err by not requiring moving party to post a bond, because the case was public interest environmental litigation).

V.      **Conclusion**

Plaintiffs ask the Court to issue a temporary restraining order restraining

defendants from enforcing or threatening to enforce their new petition circulation

prohibitions adopted May 2, 2023, and not to require a bond.

Dated: May 10, 2023               Respectfully submitted,

/s/ James D. Leach
James D. Leach
Attorney at Law
1617 Sheridan Lake Rd.
Rapid City, SD 57702
Tel: (605) 341-4400
jim@southdakotajustice.com
Attorney for Plaintiff

Certificate of Service

I served this document on defendants on May 10, 2023, by e-mailing a copy
to Daniel Haggar, Minnehaha County States Attorney, at
dhaggar@minnehahcounty.org, and to Eric Bogue, Chief Civil Deputy States
Attorney, at ebogue@minnehahacounty.org.

/s/ James D. Leach
James D. Leach

24