UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DAKOTANS FOR HEALTH, RICK WEILAND, ADAM WEILAND,<br><br>Plaintiffs,<br><br><br>vs.<br><br>LEAH ANDERSON, MINNEHAHA COUNTY AUDITOR, SUED IN HER OFFICIAL CAPACITY; JEAN BENDER, MINNEHAHA COUNTY COMMISSIONER, SUED IN THEIR OFFICIAL CAPACITY; DEAN KARSKY, MINNEHAHA COUNTY COMMISSIONER, SUED IN THEIR OFFICIAL CAPACITY; GERALD BENINGA, MINNEHAHA COUNTY COMMISSIONER, SUED IN THEIR OFFICIAL CAPACITY; JEN BLEYENBERG, MINNEHAHA COUNTY COMMISSIONER, SUED IN THEIR OFFICIAL CAPACITY; AND JOE KIPPLEY, MINNEHAHA COUNTY COMMISSIONER, SUED IN THEIR OFFICIAL CAPACITY;<br><br>Defendants. | 4:23-CV-04075-RAL<br><br><br><br><br>OPINION RENEWING TEMPORARY RESTRAINING ORDER PENDING DECISION ON PRELIMINARY INJUNCTION AND NOTIFYING PARTIES OF INTENDED COURT VIEW |

## I.     Procedural History and Facts

On May 10, 2023, Plaintiffs Dakotans for Health, Rick Weiland, and Adam Weiland (Plaintiffs) filed a Complaint naming in their official capacities Defendants Minnehaha County Auditor Leah Anderson and Minnehaha County Commissioners Jean Bender, Dean Karsky, Gerald Beninga, Jen Bleyenberg, and Joe Kippley (Defendants). Plaintiff Dakotans for Health is a South Dakota ballot question committee, Plaintiff Rick Weiland is its chair, and Plaintiff Adam

Weiland works for the entity and helps manage it. Doc. 1 ¶¶ 1–3; Doc. 4 ¶¶ 1–3. Dakotans for Health successfully obtained signatures to put expansion of Medicaid on the 2022 South Dakota ballot and have drafted and are circulating petitions to place on the November 2024 South Dakota ballot, as they put it, "measures that would allow the people of South Dakota to choose to restore their <u>Roe v. Wade</u> rights, and to eliminate the state sales tax on food." Doc. 1 ¶ 10; Doc. 4 ¶ 4. Defendants are the current Auditor and commissioners of Minnehaha County who were involved in adopting a LIMITED PUBLIC USE POLICY on May 2, 2023, that, among other things, requires petition circulators to "check-in" with the Auditor and restricts petition circulators to "designated areas" apart from the entrances to the Minnehaha County government buildings.

The Complaint seeks a temporary restraining order, preliminary and permanent injunctive relief, attorney's fees and costs, and invokes federal jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988. The Complaint pleads three causes of action (1) "Prohibition of Core Political Speech" by Defendants' new policy adopted May 2, 2023, restricting petition circulation to small rectangular areas removed from public entries to the Minnehaha County Courthouse and Minnehaha County Administration Building and directing that those opposing the petitions share the same small space; (2) "Vague and Standardless Regulation and Prior Restraint of Core Political Speech" by the new policy requiring that any person circulating a petition "must check-in at the Minnehaha County Auditor's office prior to conducting any Political Activity on the Minnehaha County campus to permit the placement of safety markers and to verify space availability within the Designated Areas," with no other standards or rules for how the Auditor is to exercise that discretion; and (3) "Unconstitutional Preregistration of Speakers" which assumes that the new preregistration requirement would include disclosure of name, address, date of birth, telephone

2

number, and email address with such information being publicly available.[1] Doc. 1. Plaintiffs'

filings included a Motion for Temporary Restraining Order, Doc. 3; Declarations of Plaintiff Rick

Weiland and Cory Heidelberger, Docs. 4, 5; and a Memorandum in Support of the Motion for

Temporary Restraining Order, Doc. 6.

On May 11, 2023, this Court entered an Opinion and Temporary Restraining Order, Doc.

10, effectively enjoining two aspects of Defendants' new LIMITED PUBLIC USE POLICY

adopted on May 2. The Temporary Restraining Order blocked enforcement of the provision

requiring pre-registration of petition circulators with the County Auditor and all provisions

restricting petition circulators to the two rectangular "designated areas" removed from main entries

into the Administration Building and the Courthouse. Doc. 10 at 12. Although the temporary

restraining order did not touch certain other aspects of the new county policy, the effect of the

Temporary Restraining Order was to preserve a status quo that had existed before May 2, 2023,

regarding petition circulator activity on the Minnehaha County campus.

The parties cooperated with this Court to set an evidentiary hearing for Friday, May 26. In

the days leading up to the evidentiary hearing, Defendants filed their Memorandum of Law in

Opposition to Plaintiff's Motion, Doc. 23; and Declarations of Melinda Storley, Leah Anderson,

Craig Olson, Daniel Fritz, Alex Hagen, and Kim Colwill, Docs. 24, 25, 26, 27, 28, 30, 32; after

---

[1] Plaintiffs were assuming in their third claim what the mandatory "check-in" with the Auditor might include. This Court was disinclined to make the same assumption when it issued its Opinion and Temporary Restraining Order. Auditor Anderson in an affidavit and testimony has disavowed that the check-in procedure requires anyone to provide personal information, but simply is to notify the auditor of the need to place cones to mark off the designated areas contemplated in the LIMITED PUBLIC USE POLICY. Doc. 25 at 4–5. That explanation, though appreciated, is not clear from the language of the policy itself.

which Plaintiffs filed a Reply Memorandum, Doc. 35, and a Declaration of James D. Leach, Doc. 36.

At the beginning of the evidentiary hearing on May 26, this Court noted that by its terms, the Temporary Restraining Order had expired at 4:38 p.m. on the prior afternoon, May 25. Plaintiffs presented testimony from Cory Heidelberger, Plaintiff Adam Weiland, Lloyd Ringrose, and Plaintiff Rick Weiland. Defendants presented testimony from four Minnehaha County employees: Kimberly Colwill, Rebecca Carpenter, Melinda Storley, and Defendant Leah Anderson. Both sides introduced various exhibits. The evidentiary hearing on the preliminary injunction consumed most of the day. At the end of the hearing, this Court mused about whether a Temporary Restraining Order under Rule 65(b) of the Federal Rules of Civil Procedure could be renewed after both sides had been heard and contemplated working over Memorial Day weekend to issue a prompt ruling on the preliminary injunction motion on Tuesday, May 30. This renewal of the Temporary Restraining Order issues because this Court does not want to be too hasty with its decision on the motion for preliminary injunction, wants to view in person the Minnehaha County campus to ensure a proper mental picture of the relevant areas before finalizing a ruling, and has concluded that a one-time renewal of a temporary restraining order may occur even when both parties have appeared and been heard.

This case concerns petition circulation principally outside the west (or for the public main) entrance to the Administration Building. Though the new LIMITED PUBLIC USE POLICY restricts political activity generally on the Minnehaha County campus, both petition circulators' activity and Defendants' reasons for changing their policy focus on or near the west entrance to the Administration Building.

4

Minnehaha County is the most populous county in South Dakota containing most of the population of the state's largest city, Sioux Falls. The Administration Building houses county offices, links to the Minnehaha County Courthouse, and is adjacent to the Public Safety Building housing the Sheriff and Minnehaha County Jail. Minnehaha County residents enter the building to transact business with the county, including, among many other things, registering to vote and voting absentee; obtaining or transferring title to such things as a vehicle, motorcycle, or boat; paying property taxes; obtaining a marriage license or death certificate; and (at least for those conditioned to parking in the largest parking lot) to visit the courthouse for jury duty or other court business. When the Administration Building is open for business, there is a steady flow of people in and out of the west (or main) entrance.

Members of the public typically enter the Administration Building through the west entrance. To the west of the building is a large free-of-charge parking lot, large enough to accommodate (based on an aerial photograph) more than 150 vehicles, with access points off Minnesota Avenue and West 6th Street. Hr'g Ex. 4. The building itself is long and lean and arcs with its longer side facing west. Hr'g Exs. 4, 5, 5A, 5B. There are public sidewalks nearer to the south and east sides of and entrances to the building, where there is limited parking controlled by meters or reserved for law enforcement. The most used sidewalk is one that arcs along the west side of the building, separating the parking lot from the building itself. This sidewalk was measured at six feet and eight inches in width, but vehicles (based on aerial photographs some 24 spots with some reserved for handicapped parking) can and do park along this sidewalk with front bumpers sometimes overlapping the curb and part of the sidewalk. See Hr'g Ex. 4. Beyond those parking spots horizontal to the sidewalk along the west side of the building is a lane for traffic entering, leaving, or circling the parking lot. Id. The west entrance has a small awning protruding

5

over its two doors, and those two doors open to a vestibule before another pair of doors lead into the building itself. Hr'g Ex. 106–106F. Inside those second set of doors for those accessing the building from the west are the building's elevators.

Also entering and exiting the Administration Building, naturally enough, are employees of Minnehaha County. Most employees do not park in the west parking lot, but in other parking lots, where their closest entrances are on the south end of the building or the east side of the building. Some employees are allowed to park in the west parking lot, including employees with mobility issues. In short, some county employees regularly use the west entrance to the building, although the vast majority of those using the west doors are not county employees.

Because of the steady flow of people in and out of the west door of the building, petition circulators off and on for many years have stood near to the west doors to approach people about signing a petition. Defendants' policy predating May 2, 2023, begins with the sentence "Minnehaha County buildings, particularly the Administration Building, have traditionally been popular locations for citizens collecting signatures for ballot petitions." Hr'g Ex. 2. Lloyd Ringrose, who has worked as a petition circulator since 1996 or 1997 for eight to ten ballot initiatives and for various candidates, called the west entrance to the Administration Building the consistently best place to collect signatures on petitions. Plaintiff Adam Weiland, who oversees Plaintiff Dakotans for Health's petition drives, estimated that of the more than 50,000 statewide signatures that Dakotans for Health collected on its petition to place expansion of Medicaid on the South Dakota ballot, approximately 10,000 of those were collected outside the west entrance to

6

the Administration Building.[2]   Adam Weiland explained that those entering and exiting the building represent a diverse stream of people hard to find anywhere else.

Petition circulators to be effective need to be in a high-pedestrian traffic area, close enough to invite voters in a conversational tone to consider signing the petition.   Particularly in South Dakota, confrontational or aggressive or impetuous behavior from petition circulators is counterproductive to the goal of getting people to sign a petition for a ballot initiative. Accordingly, Dakotans for Health has instructions to its petition circulators to "Stick to the Script. Your goal is to get the signature, not win the argument. Lengthy discussion and debates distract from that. So stick to the script. It is that simple." Hr'g Ex. 8 at 5.   Even though it benefits petition circulators to be as civil as possible, as noted below, incivility and lack of adherence to the county policy predating May 2 led to the LIMITED PUBLIC USE POLICY. But before discussing that, this Court seeks the opportunity to verify its mental image of the Minnehaha County buildings campus.

The undersigned knows well the west entrance and the building because the Administration Building used to be the Minnehaha County Courthouse, and the undersigned entered the building through that same west entrance perhaps a couple hundred times, continuing to use the west entrance at times to access the new Minnehaha County Courthouse which is attached to the building.   More than a few of those visits included encountering or passing by someone outside

---

[2] Defendants questioned the reliability of this number, and indeed this was merely an estimate given by witness Adam Weiland.   After Adam Weiland testified about personally collecting signatures on a petition outside the Administration Building and the uniqueness and importance of this location for petition collection, this Court asked him about how many signatures were collected outside that building on the expansion of Medicaid ballot initiative that Dakotans for Health managed to get on the South Dakota ballot.   Adam Weiland gave an estimate of 10,000 such signatures and explained that Dakotans for Health track generally where petition circulators are obtaining signatures.   No witness testified to actual traffic numbers of those entering and exiting through the west entrance to the building.

the west entrance seeking signatures on a petition.   Upon concluding a 20-year career as a litigation/trial lawyer at a Sioux Falls firm toward the end of 2009, however, the undersigned has entered the Administration Building much more infrequently, perhaps just annually.   The undersigned of course is not a witness to anything, and any federal district judge presently on the draw for civil cases in the Southern Division of the District of South Dakota would have similar familiarity with the building and experience.  But the undersigned in those possibly two hundred or so visits using the west doors to enter the Administration Building never considered whether the sidewalk outside the west entrance is a traditional or designated public forum or a non-public forum, nor gave thought to what, if this is indeed a designated public forum as was this Court's initial supposition (now under reconsideration as this Court reads cases cited by Defendants), constitutes a narrowly tailored restriction on First Amendment rights not substantially broader than necessary to achieve the Defendants' interests.  Thus, unless the parties object for good cause on or before June 1, this Court will quietly and quickly conduct its own court view of the premises to aid in its determination of disputed issues, aiming for a time when petition circulators or protestors will not be in the area.

Before May 2, 2023, Defendants' policy on petition gathering on Minnehaha County property was:

A. PETITION GATHERERS
Minnehaha County buildings, particularly the Administration Building, have traditionally been popular locations for citizens collecting signatures for ballot petitions.  Minnehaha County appreciates those citizens who wish to take an active role in federal, state and local government decisions.  County buildings are also public facilities that need to accommodate many people everyday without any unnecessary delay or inconvenience.  Therefore the county has adopted guidelines for individuals gathering petitions on county property.  All persons wishing to gather signatures for a ballot question on Minnehaha County property will abide by the following guidelines

1. Remain outside of county buildings and not obstruct individuals as they enter and exit the building.

2. Conduct themselves in a polite, courteous and professional manner.

3. In the case of severe weather, the Commission Administrative Officer may allow individuals collecting signatures to stand inside the Administration Building entry-way if they do not impede those entering and leaving the building.

Hr'g Ex. 2.

Defendant Minnehaha County Auditor Leah Anderson (Anderson) on May 2, 2023, submitted to the Minnehaha County Commission a memorandum titled "ACTION REQUESTED: A Motion to Approve an Update to our Public Use Policy." Hr'g Ex. 1 at 1. Anderson's memo characterized the existing policy as "vague in specifications of designated areas that political activity can take place" and noted "an increase in this activity" such that we "would like to have better control over where these activities take place on our campus." Hr'g Ex. 1 at 1. Anderson explained "[o]ften times there will be petition signature collectors inside the vestibule area, which creates a traffic flow problem." Hr'g Ex. 1 at 1. Anderson's memo initially struck this Court as scarcely justifying the new policy; after all, the existing policy already made clear that the vestibule was off limits to petition circulators and addressed congestion by requiring them to "[r]emain outside of county buildings and not obstruct individuals as they enter and exit the building," and required "polite, courteous and professional" behavior by those circulators. Hr'g Ex. 2.

Defendants filed the transcript of the portion of the May 2, 2023, meeting of the Minnehaha County Commission where Anderson presented the LIMITED PUBLIC USE POLICY. Doc. 28-1. Anderson began by telling the Commission that "there was an existing policy for limited public use," misspeaking by adding the word "limited" to the prior Public Use Policy. Compare Doc. 28-1 at 1 to Hr'g Ex. 1 at 1 and Hr'g Ex. 2. After summarizing the proposed change to designate two rectangular areas away from entrance doors for political activity, Anderson assured the

Commission that she "worked with facilities and also with state's attorney to make sure that this is doable." Doc. 28-1 at 3. In response to a question from Commissioner Karsky, Anderson said correctly that "there isn't any boundary [under the then-existing policy], except that they're not supposed to come inside" but then immediately added "and even that's not clearly stated." The commissioners appeared not to have the prior policy, which directed petition circulators to "[r]emain outside of county buildings and not obstruct individuals as they enter and exit the building" and restricted petition circulator entry into the building as follows: "In the case of severe weather, the Commission Administrative Office may allow individuals collecting signatures to stand inside the Administration Building entry-way if they do not impede those entering and leaving the building." Hr'g Ex. 2. Anderson later made a similar omission before the commission. Doc. 28-1 at 10 ("[I]n the previous policy, it stated in the case of severe weather those collecting signature may stand inside the entryway if they do not impede those entering and exiting."). Anderson described the primary focus of the policy change by stating: "The thing that we wanted to address the firmest is that they cannot come inside the building and stand where the doors are to get the signatures and block the sidewalk." Doc. 28-1 at 5. After referring to accessibility of wheelchairs into the building, Anderson said "So we need to make the building as accessible as possible without having three or four people standing right by the door, grabbing people as they come in and out." Doc. 28-1 at 5. Anderson said that she thought citizens did not appreciate passing by petition circulators. Id.

No member of the public spoke for or against the LIMITED PUBLIC USE POLICY. Doc. 28-1. Plaintiffs received no notice that any such policy was being considered and would have objected to the new policy if they had received notice. Of course, Defendants were not duty bound to notify Plaintiffs in advance of consideration of such a policy change.

10

The Minnehaha County Commission then unanimously approved on May 2, 2023, the new "LIMITED PUBLIC USE POLICY," which reads:

> Minnehaha County buildings exist to accommodate the business of county government, the courts, and the citizens of Minnehaha County. As such all buildings, adjacent grounds, sidewalks and parking facilities are nonpublic forums. While Minnehaha County appreciates those citizens who wish to take an active role in federal, state and local government decisions, county buildings must accommodate many people every day without any unnecessary delay or inconvenience.
>
> In an effort to preserve public safety and provide citizens the opportunity to conduct their county business without unnecessary disruption or inconvenience while at the same time provide for locations from which individuals or groups ("Utilizers") may circulate petitions, distribute information, and engage in other first amendment activities ("Political Activity"), the Minnehaha County Commission has approved the following "Limited Public Use Policy."
>
> Utilizers may only use specifically designated areas at select facilities on the Minnehaha County campus to conduct Political Activity. The select facilities are defined as the Minnehaha County Courthouse and the Minnehaha County Administration Building.
>
> ### AREAS WHERE POLITICAL ACTIVITY IS PERMITTED
>
> #### Minnehaha County Courthouse
>
> Outside:    Political Activity is allowed on the south sidewalk below the main entrance doors as specifically depicted on the attached color-coded map.
>
> #### Minnehaha County Administration Building
>
> Outside:    Political Activity is allowed in the area described as that portion of the Administration Building parking lot located approximately twenty-five feet (25')[3] west of the main entrance doors as specifically depicted on the attached color-coded map.
>
> Collectively these areas are hereinafter referred to as the "Designated Areas."
>
> ### CONDUCT DURING POLITICAL ACTIVITY

---

[3] Plaintiffs presented testimony that the "designated area" to the west of the Administration Building is actually 53.3 feet west of the main entrance doors.

1. Due to limited space and safety concerns within the Designated Areas, all Utilizers must check-in at the Minnehaha County Auditor's office prior to conducting any Political Activity on the Minnehaha County campus to permit the placement of safety markers and to verify space availability within the Designated Areas.
2. Utilizers using the Designated Areas must remain outside of county buildings and within the Designated Areas when conducting any Political Activity;
3. Utilizers may approach individuals for the purpose of asking them to sign a petition provided the Utilizers are within the Designated Areas;
4. Utilizers shall not, at any time, prevent access to county buildings or obstruct vehicular or pedestrian traffic within the parking area or as individuals enter or leave county buildings;
5. Utilizers must conduct themselves in a polite, courteous and professional manner including, but not limited to, respecting an individuals' right to decline to sign a petition;
6. Utilizers must respect the rights of other individuals utilizing the Designated Areas including, but not limited to, petition circulators and other individuals engaged in Political Activity;
7. Utilizers shall not follow any individual into any building or other area of the county campus where Political Activity is prohibited;
8. Utilizers shall not leave any material unattended within the Designated Areas, including without limitation: petitions, signs, banners, pamphlets, tables, and chairs;
9. Utilizers may seek refuge inside of the Administration Building in the event of severe weather provided that all Political Activity cease inside the Administration Building and such individuals do not impede those entering and leaving the building.

PLEASE NOTE: Pursuant to SDCL 12-18-3, all petition circulation and any other Political Activity must cease on the Minnehaha County campus during the period of absentee voting and on the day of the election as the County Administration Building is considered a polling place.

Note:  Any questions regarding this policy should be directed to the Auditor's Office (1st floor of the County Administration Building).

Hr'g Ex. 1 at 2-3.

Defendants present in Declarations and preliminary injunction hearing testimony that Anderson had additional grounds not contained in her memo or statements to the commission to justify the terms of the LIMITED PUBLIC USE POLICY. Defendants' witnesses generally

acknowledge that there were very few issues with petition circulators until four to six months ago.[4] The office manager of the State's Attorney's Office who has worked for 20 years in the Administration Building testified that, although her parking is closer to the south entrance, in nicer weather she walks the extra distance to enter and exit through the west entrance. In past years, petition circulators there were polite and respectful and never blocked the door; they simply asked if she was a registered voter and if she wanted to sign whatever petition they had. She observed that in the last six months petition circulators have become more persistent where a simple "no thank you" no longer suffices. She described one incident where a tall, local political gadfly[5] (with a petition the content of which she did not know) invaded her personal space by getting within four feet of her such that she could feel his breath and following her to her car while making an unwelcome and somewhat creepy comment about how she looked like Senator Kyrsten Sinema of Arizona.

For context regarding the next two defense witnesses, some mention must be made of the subject matter of the petition that Dakotans for Health began circulating some months ago. Plaintiffs are seeking to place on the ballot, as mentioned above and as they put it, a measure whereby South Dakotans "could choose to restore their Roe v. Wade rights." A ballot question committee named Life Defense Fund has formed to oppose "measures to legalize abortion in South Dakota." Hr'g Ex. 9. The person listed as Chair of the Life Defense Fund wrote about frustrating Dakotans for Health's efforts as follows: "Beginning this November [of 2022], we must stand next

---

[4] One of Defendants' witnesses mentioned chatter through the years from county employees who disliked petition circulating generally but was among those identifying changes beginning last fall with behavior of petition circulators.

[5] This individual, identified by name during the evidentiary hearing, unsuccessfully ran for mayor in 2022 finishing last with 574 votes, which was 6,770 votes behind the next closest finisher and more than 21,000 votes behind the mayoral victor.

to their petition circulators, explain to the public how radical this amendment is, and encourage our fellow citizens not to sign the petition." Hr'g Ex. 10. Accordingly, for the first time in any witness's recollection, petition circulators outside the Administration Building on the Roe v. Wade petition are met by what one witness called "petition blockers," leading to voters being exposed on site to differing views on perhaps the single most intractably divisive issue in the United States. Dakotans for Health, in addition to admonitions to its circulators not to engage in debates with citizens, has written specifically to its circulators: "PRACTICE CIVILITY. Remember to channel the spirit of Dr. Martin Luther King Jr. and keep your cool if anti-choice activists try to bully and intimidate you." Hr'g Ex. 7 at 2. Notwithstanding that admonition, a hired petition circulator for Dakotans for Health quarreled with a petition blocker outside the Administration Building on February 28 and March 1, 2023. The incident prompted the Minnehaha County's Commission Assistant to write her first Surveillance Report in her seven years in the position about misbehavior of those associated with petition circulation. She wrote: "Incident as of 2/28/23: Petition circulator & Blocker exchanged words. Court Security addressed expected behavior with them. Both parties wanted clarity on rights each have. [Petition circulator] has a 6' table along the wall [outside of west entrance] & south of the west middle Admin[istration Building] door with clip boards & leaflets (pro abortion)." Hr'g Ex. 109. The next day, she wrote in the same Report: "Incident 3/01/23: At approximately 12:55:07 p.m. [Petition Circulator] took Blocker's sign & leaflets (against abortion) and threw them in the construction dumpster south of the west middle Admin[istration Building] door while the Blocker was up at the commission office asking for clarity." Hr'g Ex. 109. The same court security officer, this time with the County's attorney, again

14

spoke with the Dakotans for Health petition circulator[6] who left thereafter; Dakotans for Health became aware of this incident (but none of the others) and chastised the circulator. There have been no similar situations since.

The same circulator, however, on other occasions had entered and remained in the vestibule area, and 12 to 24 times this Commission Assistant (who views security cameras) asked him to leave the vestibule. The Commission Assistant testified that, before May 2, paper-sized signs were posted on the exterior vestibule windows containing the restrictions on petition circulators, including that they were not to enter the vestibule. The Commission Assistant, who had prior to her seven years in the position worked in the adjacent Public Safety Building in a different county position, acknowledged that circulators get a steady flow of individuals at the west doors to the Administration Building and that from her perspective the problems with petition circulators began arising last fall.

On March 2, 2023, the Commission Administrator received an email from an 18-year veteran of the Minnehaha County State's Attorney's Office complaining about a petition circulator asking for her to sign a petition daily and someone there handing out papers encouraging her not to sign the petition. Hr'g Ex. 108. This employee testified that she uses the west entrance to the Administration Building because she is one of the employees with reduced mobility authorized to park in that west lot. Petition circulators were outside that door frequently and historically were polite, though that changed in the last few months. This employee used crutches or a cane to ambulate this past winter and had to navigate the snow and ice, disliking the congestion of petition circulators and blockers near the door and the question "Do you believe in a woman's right to

---

[6]This person was also identified by name at the preliminary injunction hearing and is not Mr. Ringrose, whose petition circulating work presently is the ballot initiative to end the state sales tax on food.

choose?"  She witnessed an occasion where the petition circulator and blocker got into a heated discussion as she was trying to enter the County Administration Building.  This employee's March 2 email asked about whether the circulator and blocker could be moved away from the door.  Hr'g Ex. 108.  It is the only written complaint about petition circulators and blockers, though the Commission Administrator received other complaints from employees and citizens.

Auditor Anderson was sworn in on March 6, 2023, becoming a county employee on that date.  She had met with employees in advance and talked with the Commission Administrator about what the current policy was concerning petition circulation, receiving the Pennington County[7] policy from the Commission Administrator at that time.  She saw petition circulators in the vestibule (as she can access security cameras) after she started and personally would tell them to step outside, having to do so twice with the same circulator with whom the Commission Administrator had problems.  She felt that the problem was an inability to hold anyone accountable.  She testified that the "check-in" requirement simply was to allow for someone to place orange cones at the boundary of the "designated area" for traffic control and safety, not wanting to leave orange cones out generally where someone might swipe them.

Plaintiffs' counsel in cross-examining the Defendants' witnesses repeatedly pointed out that enforcement of the prior policy would have addressed all these complaints.  After all, the prior policy required petition circulators to remain outside, to not obstruct individuals as they enter and exit the building, to conduct themselves in a polite, courteous, and professional manner, and to

---

[7] The Pennington County policy does not have a petition circulator check-in component, but designates areas where signature gathering may occur.  Doc. 28-2 at 1–2.  Those areas are "near the main entrance doors" and at "the elevated entrance area outside the 2nd floor main entrance doors."  Doc. 28-2 at 1, 3–4.  The policy also adopts a Code of Conduct for petition circulators.  Doc. 28-1 at 1–2.

enter the vestibule only if allowed by the Commission Administrative Officer in case of severe weather. Hr'g Ex. 2.

Defendants' new policy creates rectangular "designated areas" for political activities including petition circulating and blocking activity. Hr'g Ex. 1. The "designated area" outside the Administration Building is 53.3 feet outside of the west entrance to the building in an area of the parking lot, although oddly the policy language described it to the Commission as being only 25 feet outside those doors. Hr'g Ex. 1. Instead of allowing petition circulators to be near the doors where they can engage in a conversation with those entering and exiting the building, the circulator will have to call out across a lane of travel and one row of parked cars, from a distance of between 15 and 17 yards away, at people as they walk into the building or hope that someone parks close enough to the "designated area" that they might walk past them. Plaintiffs note that the new policy puts about 99.3% of the outdoor space of the Minnehaha County government buildings off limits to petition circulators and requires them to stand in an area with no cover, fully exposed to the sun, rain, or snow. Plaintiffs likely would not mind that 99% of the Minnehaha County campus was placed off limits, as long as the remaining 1% was near enough to the west entrance to the Administration Building to allow for a conversation with those entering and exiting the building. The new policy plainly makes it much less likely that those entering or exiting the Minnehaha County buildings will engage at all with petition circulators. Mr. Ringrose, the circulator who has worked on ballot initiatives and candidate petitions since the 1990s outside of the Administration Building, testified that he would not bother seeking to collect signatures from the "designated area" due to its distance from the door and the resulting inability to engage with voters in a conversational tone.

Plaintiffs also believe that the "designated area" in the parking lot leads to safety concerns because a petition circulator will have to try to entice someone across a moving lane of vehicles (although this lane may have to be crossed depending on where a person parks within the parking lot). Plaintiffs say that proximity to the building also provides shelter from the sun, wind, rain, and snow. Realistically petition circulators receive protection next to the building from the sun only in the morning and from wind or precipitation only if there is a breeze out of the east, northeast, or southeast. Plaintiffs also contend that confining petition circulators and blockers in the same rectangle and alongside other petition circulators creates congestion of a different sort, which is true in part but also occurred but simply closer to the building historically.

## II.    Legal Standard for Temporary Restraining Order

Rule 65(b)(1) and (2) of the Federal Rules of Civil Procedure provides as follows:

**(b) Temporary Restraining Order.**
    **(1)** *Issuing Without Notice.* The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
        **(A)** specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
        **(B)** the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

    **(2)** *Contents; Expiration.* Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

"A district court considering injunctive relief evaluates [a] the movant's likelihood of success on the merits, [b] the threat of irreparable harm to the movant, [c] the balance of the equities between the parties, and [d] whether an injunction is in the public interest." Powell v. Ryan, 855 F.3d 899, 902 (8th Cir. 2017) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d

109, 114 (8th Cir. 1981) (en banc)). "No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue. However, in deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." <u>Turtle Island Foods, SPC v. Thompson</u>, 992 F.3d 694, 699 (8th Cir. 2021) (cleaned up and citations omitted).

The focus in considering a temporary restraining order is whether the moving party "clearly show[s] that immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). This Court determined previously that Plaintiffs had made such a showing, preliminarily analyzing the claims based on material available then under the <u>Dataphase</u> factors, even though Rule 65(b) does not expressly apply those factors to the decision to grant a temporary restraining order.

At the conclusion of the preliminary injunction hearing, this Court questioned whether a temporary restraining order could be renewed once when, as has occurred here, the opposing party has been heard. Under Rule 65(b)(1), after all, the temporary restraining order issues "without written or oral notice" on certain specified conditions. Rule 65(b)(2) permits the temporary restraining order to be renewed "for good cause" for another period of no longer than 14 days or longer if "the adverse party consents to a longer extension." The allowance of a longer extension upon the adverse party's consent connotes that an extension of a temporary restraining order can occur even after the adverse party has been heard. According to a leading treatise, "[t]he cases are not very helpful in providing guidance to a party who wishes to have a temporary restraining order extended beyond 14 days." 11A Mary Kay Kane, <u>Federal Practice and Procedure</u> § 2953 (3d ed. Updated April 2023). The same treatise notes a dearth of case law on what constitutes "good cause" to extend a temporary restraining order, but reasons "a showing that the grounds for

originally granting the temporary restraining order continue to exist should be sufficient." Id. Good cause exists here because this Court simply needs some additional time to think through the legal issues, to view the premises at issue unless a party objects, and to write the decision on whether to grant a preliminary injunction. See SEC v. AriseBank, No. 3:18-CV-186-M, 2018 WL 10419828, at *1 (N.D. Tex. Mar. 9, 2018) ("Courts have found good cause to extend TROs, for example, where the court needed time to fully consider the various arguments and motions of the parties . . . ." (cleaned up and citation omitted)); Flying Cross Creek, LLC v. Central Hockey League, Inc., 153 F. Supp. 2d 1253, 1260 (D. Kan. 2001) (explaining that good cause could exist when "the court's calendar cannot reasonably accommodate an earlier setting for the preliminary injunction hearing"). The extension of the temporary restraining order preserves the policy as it existed before May 2, 2023, and as it has existed since May 11, 2023.

Rule 65(b)(2) by its terms anticipates that a motion to extend the temporary restraining order be made before it expires, and the initial temporary restraining order expired by its terms at 4:38 p.m. on May 25, before this Court conducted the evidentiary hearing on the preliminary injunction consuming Friday, May 26, before the Memorial Day Weekend. This Court had provided counsel with a few available dates before May 26 for a preliminary injunction hearing, but counsel chose what date worked for all involved, which happened to be the day immediately after the injunction expired. Rule 1 of the Federal Rules of Civil Procedure directs that the rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Extending the temporary restraining order at this time serves these purposes, lest this Court be forced to rush out a decision that is unjust or contains legal error prompting an appeal that otherwise would be avoidable.

Rule 65(b)(2) requires that "reasons for an extension [of a temporary restraining order] must be entered in the record." This decision does so and what follows largely parallels the initial reasoning in the temporary restraining order.

### III. Discussion

#### A. The movant's likelihood of success on the merits

Plaintiffs have made enough of a showing of success on the merits to justify extending the temporary restraining order. "[G]overnment entities are strictly limited in their ability to regulate private speech in . . . 'traditional public fora.'" <u>Pleasant Grove City v. Summum</u>, 555 U.S. 460, 469 (2009) (cleaned up and citations omitted). "Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum." <u>Id.</u> at 469–70.

> [I]n a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content[8] of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

<u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989) (cleaned up and citation omitted); <u>see also</u> <u>Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n</u>, 460 U.S. 37, 45 (1983) ("The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative

---

[8] Preliminarily, Defendant's new policy appears to be content-neutral. Of course:

> Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. Courts will apply a strict scrutiny analysis when the regulation discriminates on the basis of content, and a more lenient analysis to content-neutral regulations.

<u>Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks</u>, 864 F.3d 905, 913–14 (8th Cir. 2017) (cleaned up and citations omitted).

channels of communication."). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward, 491 U.S. at 800

Defendants raise an argument that the sidewalk on the Minnehaha County campus outside the west entrance to the Administration Building is not a public forum or a designated public forum. Doc. 23. Defendants argue that this Court must defer to Defendants' new policy because it is "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800 (1985). This Court discussed during the hearing how United States v. Kokinda, 497 U.S. 720 (1990), seems to be the seminal case on whether this sidewalk is a public forum or traditional public forum such that the narrowly tailored standard applies. In Kokinda, the Supreme Court split 4-1-4 on whether a sidewalk leading into a post office was a non-public forum for solicitation activity that implicated First Amendment rights to a lesser extent than ballot initiative petition circulation. Cases decided after Kokinda leave a somewhat convoluted and occasionally inconsistent rubric for evaluating whether an area is a traditional public forum or non-public forum. See, e.g., Ball v. City of Lincoln, 870 F.3d 722 (8th Cir. 2017).

The "narrow tailoring requirement means not only that the regulation must promote a substantial government interest that would be achieved less effectively absent the regulation, but also that the factual situation demonstrates a real need for the government to act to protect its interests." Johnson v. Minneapolis Park & Recreation Bd., 729 F.3d 1094, 1099 (8th Cir. 2013) (cleaned up and citations omitted). The protected interest cannot be abstract, and instead "there must be a genuine nexus between the regulation and the interest it seeks to serve." Id. The

"[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward, 491 U.S. at 799. "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" Ams. for Prosperity Found. v. Bonta, 141 S. Ct. 2373, 2384 (2021) (quoting NAACP v. Button, 371 U.S. 415, 433 (1963)).

The Supreme Court of the United States has declared "[p]etition circulation . . . is 'core political speech,' because it involves 'interactive communication concerning political change.' First Amendment protection for such interaction . . . is 'at its zenith.'" Buckley v. Am. Const. L. Found., 525 U.S. 182, 186–87 (1999) (internal citations omitted) (quoting Meyer v. Grant, 486 U.S. 422, 425 (1988)). Whether the narrowly tailored or reasonableness standard applies could well be outcome-determinative here.

Turning to the facts alleged here, Plaintiffs have standing and have alleged claims cognizable in federal court. This Court plans to analyze likelihood of success on the merits in much greater depth when it decides the preliminary injunction motion. While understanding better what motivated the new policy, this Court remains skeptical that all provisions of Defendants' new policy are "narrowly tailored to serve a significant government interest." Ward, 491 U.S. at 791. The underlying explanation in Anderson's memorandum and the introductory three explanatory paragraphs in the LIMITED PUBLIC USE POLICY justified neither such a small geographic restriction on petition circulators nor placement of that area away from the entry areas to the Minnehaha County buildings. Textually the provision mandating a "check-in at the Minnehaha County Auditor's office prior to [petition circulation] . . . to permit the placement of security markers and to verify space availability" is vague, though the Auditor explained that no information about the circulator will be taken, as the purpose is just to trigger placement of orange

23

traffic cones in the "designated area" in the parking lot. Hr'g Ex. 7 at 2. These provisions seem to do more to deter and frustrate petition circulating at Minnehaha County buildings than addressing "unnecessary disruptions or inconvenience" to county operations or to those visiting county buildings, although this Court now has heard an explanation for the policy change that expands on what Anderson wrote or told the commission. Provisions 4, 5, 6 (omitting the designated area reference), 7 (to the extent of restricting following a person into a building), 8 (omitting the designated area reference), and 9 of the LIMITED PUBLIC USE POLICY may be sufficiently narrowly tailored to survive challenge.

### B.  The threat of irreparable harm to the movant

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009). "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 895 (8th Cir. 2013) (citation omitted). The irreparable nature of the harm stemming from First Amendment violations is well-recognized. Powell v. Noble, 798 F.3d 690, 702 (8th Cir. 2015) (quoting Marcus v. Pub. Television, 97 F.3d 1137, 1140 (8th Cir. 1996)) ("If [the Plaintiffs] are correct and their First Amendment rights have been violated, this constitutes an irreparable harm." (citation omitted)). Plaintiffs have shown an immediate and irreparable harm in support of their motion for temporary restraining order because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).

### C.  The balance of equities between the parties

Plaintiffs have shown an irreparable harm as discussed above. There appears to be minimal harm to Defendants to require them to revert for another period not to exceed 14 days to the policy that they had in place before May 2, 2023, or to excise from the new policy the "designated areas" provision and the "check-in" prescreening with the Auditor. On the one hand, Plaintiffs arguably face possible interruption of their First Amendment rights; on the other hand, the extension of the temporary restraining order exposes the County to endure for another 14 days the nuisance of petition circulators and blockers near the exterior doors on the west side of the Administration Building. The County can still impose the prior policy's requirements of civility, staying out of the vestibule, and not obstructing ingress or egress to the Administration Building. The balance of equities or balance of harms analysis seems to favor Plaintiffs.

### D. Whether an injunction is in the public interest

"When the federal government or agency is the defendant, the final two factors [i.e. the balance of equities between the parties and whether an injunction is in the public interest] can 'merge' into one." Noem v. Haaland, 542 F. Supp. 3d 898, 925 (D.S.D. 2021) (cleaned up and citation omitted); see also Nken v. Holder, 556 U.S. 418, 435 (2009) (stating the same). "The public interest generally is served by allowing the free exercise of First Amendment rights." Blue State Refugees v. Noem, No. 3:21-CV-3024-RAL, 2021 WL 5150358, at *4 (D.S.D. Nov. 5, 2021). The public has an interest to enter and leave county buildings without undue traffic flow problems that overly aggressive petition circulators or those protesting those petitions might create, though enforcement of the prior policy should blunt such behavior by petition circulators.

### E. Bond

Under Rule 65(c), a temporary restraining order should issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by

any party found to have been wrongfully enjoined or restrained." A temporary restraining order as sought by Plaintiffs does not cause Defendants to incur "costs and damages" apart from the costs of defending this suit generally, which do not increase through entry of a temporary restraining order. The bond requirement may properly be waived in public interest litigation. Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1043 (8th Cir. 2018). Defendants have raised no issue with waiver of the bond requirement.

### IV. Conclusion and Renewed Temporary Restraining Order

For the reasons explained, it is

ORDERED that this Court renews the Temporary Restraining Order, Doc. 10, to restrain for a period not to exceed an additional 14 days Defendants from enforcing any part of the new policy adopted May 2, 2023, that requires "check-in" with the Minnehaha County Auditor by petition circulators or restricts petition circulators to "designated areas" to allow for the drafting of a well-reasoned decision on the preliminary injunction motion. It is further

ORDERED that the bond requirement is waived. It is finally

ORDERED that the parties notify the Court by close of day June 1, 2023, by filing in CM/ECF if they have any objection to this Court conducting its own quiet and quick view of the Minnehaha County campus and Administration Building for the reasons explained above.

DATED at _4_ : _40_ p.m. this 30th day of May, 2023.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

26