UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DAKOTANS FOR HEALTH, RICK WEILAND, ADAM WEILAND,<br><br>Plaintiffs,<br><br><br>vs.<br><br>LEAH ANDERSON, MINNEHAHA COUNTY AUDITOR, SUED IN HER OFFICIAL CAPACITY; JEAN BENDER, MINNEHAHA COUNTY COMMISSIONER, SUED IN THEIR OFFICIAL CAPACITY; DEAN KARSKY, MINNEHAHA COUNTY COMMISSIONER, SUED IN THEIR OFFICIAL CAPACITY; GERALD BENINGA, MINNEHAHA COUNTY COMMISSIONER, SUED IN THEIR OFFICIAL CAPACITY; JEN BLEYENBERG, MINNEHAHA COUNTY COMMISSIONER, SUED IN THEIR OFFICIAL CAPACITY; AND JOE KIPPLEY, MINNEHAHA COUNTY COMMISSIONER, SUED IN THEIR OFFICIAL CAPACITY;<br><br>Defendants. | 4:23-CV-04075-RAL<br><br><br><br><br>OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION |

I.       **Procedural History**

On May 10, 2023, Plaintiffs Dakotans for Health, Rick Weiland, and Adam Weiland (Plaintiffs) filed a Complaint naming in their official capacities Defendants Minnehaha County Auditor Leah Anderson and Minnehaha County Commissioners Jean Bender, Dean Karsky, Gerald Beninga, Jen Bleyenberg, and Joe Kippley (Defendants). Plaintiff Dakotans for Health is a South Dakota ballot question committee, Plaintiff Rick Weiland is its chair, and Plaintiff Adam

Weiland works for the entity and helps manage it.  Doc. 1 ¶¶ 1–3; Doc. 4 ¶¶ 1–3.  Dakotans for Health successfully obtained signatures to put Medicaid expansion on the 2022 South Dakota ballot and have drafted and are circulating petitions to place on the November 2024 South Dakota ballot, as they put it, "measures that would allow the people of South Dakota to choose to restore their Roe v. Wade rights, and to eliminate the state sales tax on food."  Doc. 1 ¶ 10; Doc. 4 ¶ 4. Defendants are the current Auditor and Commissioners of Minnehaha County who were involved in adopting a "LIMITED PUBLIC USE POLICY" on May 2, 2023, that, among other things, requires petition circulators to "check-in" with the Auditor and restricts petition circulators to "designated areas" apart from the entrances to the Minnehaha County government buildings.

The Complaint seeks a temporary restraining order, preliminary and permanent injunctive relief, attorney's fees and costs, and invokes federal jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988. The Complaint pleads three causes of action: (1) "Prohibition of Core Political Speech" by Defendants' new policy adopted May 2, 2023, restricting petition circulation to two rectangular areas removed from public entries to the Minnehaha County Courthouse (Courthouse) and Minnehaha County Administration Building (Administration Building) and directing that those opposing the petitions share the same two spaces; (2) "Vague and Standardless Regulation and Prior Restraint of Core Political Speech" by the new policy requiring that any person circulating a petition "must check-in at the Minnehaha County Auditor's office prior to conducting any Political Activity on the Minnehaha County campus to permit the placement of safety markers and to verify space availability within the Designated Areas," with no other standards or rules for how the Auditor is to exercise that discretion; and (3) "Unconstitutional Preregistration of Speakers" which assumes that the new preregistration requirement would include disclosure of name, address, date of birth, telephone number, and email address with such

information being publicly available.[1] Doc. 1. Plaintiffs' filings included a Motion for Temporary Restraining Order, Doc. 3; Declarations of Plaintiff Rick Weiland and Cory Heidelberger, Docs. 4, 5; and a Memorandum in Support of the Motion for Temporary Restraining Order, Doc. 6.

On May 11, 2023, this Court entered an Opinion and Temporary Restraining Order, Doc. 10, effectively enjoining two aspects of Defendants' new LIMITED PUBLIC USE POLICY adopted on May 2. The Temporary Restraining Order blocked enforcement of the provision requiring pre-registration of petition circulators with the County Auditor and all provisions restricting petition circulators to the two rectangular "designated areas" removed from main entries into the Administration Building and the Courthouse. Doc. 10 at 12. Although the temporary restraining order did not touch certain other aspects of the new county policy, the effect of the Temporary Restraining Order was to preserve a status quo that had existed before May 2, 2023, regarding petition circulator activity on the Minnehaha County campus.

The parties cooperated with this Court to set an evidentiary hearing for Friday, May 26, 2023. In the days leading up to the evidentiary hearing, Defendants filed their Memorandum of Law in Opposition to Plaintiff's Motion, Doc. 23; and Declarations of Melinda Storley, Leah Anderson, Craig Olson, Daniel Fritz, Alex Hagen, and Kim Colwill, Docs. 24, 25, 26, 27, 28, 30,

---

[1] This Court was disinclined in its Opinion and Temporary Restraining Order to make the same assumptions as did Plaintiffs in their third claim about what the mandatory "check-in" with the Auditor might include. Auditor Anderson in an affidavit and testimony has disavowed that the check-in procedure requires anyone to provide personal information, but simply is to notify the auditor of the need to place cones to mark off the designated areas contemplated in the LIMITED PUBLIC USE POLICY. Doc. 25 at 4–5. That explanation of how the check-in requirement applies, though appreciated, is not clear from the language of the policy itself. Auditor Anderson's explanation of the check-in requirement makes its enforceability go hand-in-glove with the restriction of petition circulators to the designated areas.

32; after which Plaintiffs filed a Reply Memorandum, Doc. 35, and a Declaration of James D. Leach, Doc. 36.

At the beginning of the evidentiary hearing on May 26, this Court noted that by its terms, the Temporary Restraining Order had expired at 4:38 p.m. on the prior afternoon, May 25. Plaintiffs presented testimony from Cory Heidelberger, Plaintiff Adam Weiland, Lloyd Ringrose, and Plaintiff Rick Weiland.  Defendants presented testimony from four Minnehaha County employees: Kimberly Colwill, Rebecca Carpenter, Melinda Storley, and Defendant Leah Anderson.  Both sides introduced various exhibits.  The evidentiary hearing on the preliminary injunction request consumed most of the day.  At the end of the hearing, this Court questioned whether a Temporary Restraining Order under Rule 65(b) of the Federal Rules of Civil Procedure could be renewed after both sides had been heard and contemplated working over Memorial Day weekend to issue a ruling on Tuesday, May 30, 2023.  This Court did not want to be too hasty with its decision on the motion for preliminary injunction, wanted to view in person the Minnehaha County campus to ensure a proper mental picture of the relevant areas before finalizing a ruling, and had concluded that a one-time renewal of a temporary restraining order may occur even when both parties have appeared and been heard.  Thus, on May 30, 2023, this Court issued an Opinion Renewing Temporary Restraining Order Pending Decision on Preliminary Injunction and Notifying Parties of Intended Court View. Doc. 42.  Neither side objected to this Court conducting a court view of the Minnehaha County campus and this Court has done so.[2]  For the reasons explained below, this Court now grants in part Plaintiffs' motion for a preliminary injunction.

---

[2]The undersigned knows well the Administration Building and its west entrance because the Administration Building used to house the Minnehaha County judges and courtrooms, and the undersigned entered the building through that same west entrance perhaps a couple hundred times, continuing to use the west entrance at times to access the new Minnehaha County Courthouse, which is attached to the Administration Building through a corridor on the northeast of the

## II.   Facts

This case concerns petition circulation principally outside the west entrance to the Administration Building.  Though the new LIMITED PUBLIC USE POLICY restricts political activity generally on the Minnehaha County campus, both petition circulators' activity and Defendants' reasons for changing their policy focus on or near the west entrance to the Administration Building.

Minnehaha County is the most populous county in South Dakota[3] containing most of the population of the state's largest city, Sioux Falls.  The Administration Building houses county offices, links to the Courthouse, and is adjacent to the Public Safety Building housing the Sheriff and Minnehaha County Jail.  Minnehaha County residents enter the building to transact business with the county, including, among many other things, registering to vote and voting absentee; obtaining or transferring title to such things as a vehicle, motorcycle, or boat; paying property taxes; obtaining a marriage license or death certificate; and (at least for those conditioned to parking in the largest parking lot) to visit the courthouse for jury duty or other court business.

---

building.  More than a few of those visits included passing by someone outside the west entrance seeking signatures on a petition.  Upon concluding a 20-year career as a litigation and trial lawyer at a Sioux Falls firm toward the end of 2009, the undersigned has entered the Administration Building much more infrequently, perhaps just annually.  The undersigned of course is not a witness to anything, and any federal district judge presently on the draw for civil cases in the Southern Division of the District of South Dakota would have similar experiences and familiarity with the building.  The undersigned in those many visits using the west doors to enter the Administration Building never considered whether the sidewalk outside the west entrance is a traditional or designated public forum or a non-public forum, nor gave thought to what, if the area is indeed a public forum, constitutes a narrowly tailored restriction on First Amendment rights not substantially broader than necessary to achieve the Defendants' interests.  Thus, after notifying the litigants and receiving consent to conduct a court view, this Court quietly conducted its own court view of the premises to aid in its determination of disputed issues.  This Court focused on the physical features of the campus and talked with no one on site.
[3]The Census Bureau estimates that as of July 1, 2022, the population of the State of South Dakota was 909,824, www.census.gov/quickfacts/SD, and the population of Minnehaha County was 203,971, www.census.gov/quickfacts/minnehahacountysouthdakota.

When the Administration Building is open for business, there is a steady flow of people in and out of the west entrance.

Members of the public typically enter the Administration Building through the west entrance.  To the west of the Administration Building is a free-of-charge parking lot, large enough to accommodate about 170 vehicles, with access points off Minnesota Avenue and West 6th Street. Hr'g Ex. 4.  The Administration Building is long and lean and arcs with its longer side facing west. Hr'g Exs. 4, 5, 5A, 5B.  There are sidewalks adjacent to streets nearer to the south and east sides of the Administration Building and separate entrances on those sides.  Across the street to the south is a lot used for employee parking while to the east there are ten metered parking spots, one handicap-accessible spot, and ten spots reserved for law enforcement.  Further northeast there are four metered spots and seven parking spots, quite a ways from the Administration Building. Another parking lot with 32 spots is across 5th Street to the east, near the Old Courthouse Museum and Equalization Office Building.

On the County campus, the public most commonly uses the sidewalk that arcs along the west side of the Administration Building, separating the parking lot from the building itself.  This sidewalk links to the sidewalk along 6th Street, with the sidewalk actually widening subtly from at or just under five feet to a six-foot sidewalk along the west side of the Administration Building. The space between the west side of the building and the sidewalk is a little less than three-and-a-half feet and is landscaped with small rocks.  This sidewalk is six-feet wide with a six-to-seven-inch curb attached, but vehicles can and do park perpendicular to this sidewalk with front bumpers sometimes overlapping the curb and part of the sidewalk.  See Hr'g Ex. 4.  Along the sidewalk outside the west entrance are 30 parking spots, with one spot for law enforcement and nine for handicap-accessible parking or wheelchair vehicle parking.  Beyond those parking spots outside

the west entrance is a lane running parallel to the sidewalk for traffic entering, leaving, or circling the parking lot. Id. That traffic lane is wide enough for two vehicles coming in opposite directions to pass.

The west entrance has a small awning protruding over its two doors, and those two doors open to a vestibule before another pair of doors lead into the building itself. Hr'g Ex. 106–106F. The vestibule (the interior area between two sets of doors) is roughly nine feet by eleven feet in size. Inside the second set of doors for those accessing the building from the west are a directory of offices, signage pointing to where jurors should report, and the building's elevators to the right or south. The Administration Building has a front lawn and similar entry point on its east side, such that the east side could be considered the front of the building. But the west entrance is how the vast majority of visitors enter the Administration Building.

Also entering and exiting the Administration Building, naturally enough, are employees of Minnehaha County. Most county employees do not park in the west parking lot, but in other parking lots where their closest entrances are on the south end of the building or the east side of the building. Some county employees are allowed to park in the west parking lot, including employees with mobility issues. In short, some county employees regularly use the west entrance to the building, although most people going in and out of the west doors are not county employees.

Because of the steady flow of people in and out of the west entrance of the building, petition circulators off and on for many years have stood near to the west doors to approach people about signing a petition. Defendants' policy before May 2, 2023, began with the sentence "Minnehaha County buildings, particularly the Administration Building, have traditionally been popular locations for citizens collecting signatures for ballot petitions." Hr'g Ex. 2. Lloyd Ringrose, who has worked as a petition circulator since 1996 or 1997 for eight to ten ballot initiatives and for

7

various candidates, called the west entrance to the Administration Building the consistently best place in Sioux Falls to collect signatures on petitions. Plaintiff Adam Weiland,[4] who oversees Plaintiff Dakotans for Health's petition drives, estimated that of the more than 50,000 statewide signatures that Dakotans for Health collected on its petition to place Medicaid expansion on the South Dakota ballot, approximately 10,000 of those were collected outside the west entrance to the Administration Building.[5] Adam Weiland explained that those entering and exiting the Administration Building represent a diverse stream of people hard to find anywhere else.

Petition circulators to be effective need to be in a high pedestrian traffic area, close enough to invite voters in a conversational tone to sign the petition. Particularly in South Dakota, confrontational or aggressive or impetuous behavior from petition circulators is counterproductive to the goal of getting people to sign a petition for a ballot initiative. Accordingly, Dakotans for Health has instructed its petition circulators to "Stick to the Script. Your goal is to get the signature, not win the argument. Lengthy discussion and debates distract from that. So stick to the script. It is that simple." Hr'g Ex. 8 at 5. Even though it benefits petition circulators to be as civil as possible, as noted below, incivility and lack of adherence to the county policy predating May 2 led to the LIMITED PUBLIC USE POLICY.

---

[4]This Court uses the full names of Plaintiffs Adam Weiland and Rick Weiland so as to distinguish between them. This Court does not name the non-party county employees who testified so that their privacy can be protected to the maximum extent.

[5] Defendants questioned the reliability of this number, and indeed this was merely an estimate given by witness Adam Weiland. After Adam Weiland testified about personally collecting signatures on a petition outside the Administration Building and the uniqueness and importance of this location for petition collection, this Court asked him about how many signatures Dakotans for Health collected outside that building on the petition to place Medicaid expansion on the ballot. Adam Weiland gave an estimate of 10,000 such signatures and explained that Dakotans for Health tracks generally where petition circulators are obtaining signatures. No witness testified to actual traffic numbers of those entering and exiting through the west entrance to the building.

Before May 2, 2023, Defendants' policy on petition gathering on Minnehaha County property was:

> A. PETITION GATHERERS
> Minnehaha County buildings, particularly the Administration Building, have traditionally been popular locations for citizens collecting signatures for ballot petitions. Minnehaha County appreciates those citizens who wish to take an active role in federal, state and local government decisions. County buildings are also public facilities that need to accommodate many people everyday without any unnecessary delay or inconvenience. Therefore the county has adopted guidelines for individuals gathering petitions on county property. All persons wishing to gather signatures for a ballot question on Minnehaha County property will abide by the following guidelines
>
> 1. Remain outside of county buildings and not obstruct individuals as they enter and exit the building.
>
> 2. Conduct themselves in a polite, courteous and professional manner.
>
> 3. In the case of severe weather, the Commission Administrative Officer may allow individuals collecting signatures to stand inside the Administration Building entry-way if they do not impede those entering and leaving the building.

Hr'g Ex. 2.

Defendant Minnehaha County Auditor Leah Anderson (Anderson) on May 2, 2023, submitted to the Minnehaha County Commission a memorandum titled "ACTION REQUESTED: A Motion to Approve an Update to our Public Use Policy."[6] Hr'g Ex. 1 at 1. Anderson's memo characterized the existing policy as "vague in specifications of designated areas that political activity can take place" and noted "an increase in this activity" such that we "would like to have better control over where these activities take place on our campus." Hr'g Ex. 1 at 1. Anderson explained "[o]ften times there will be petition signature collectors inside the vestibule area, which creates a traffic flow problem." Hr'g Ex. 1 at 1. Anderson's memo initially struck this Court as

---

[6] Auditor Anderson referred to the prior policy as the "Public Use Policy," and this decision will adopt that reference as Hr'g Ex. 2 appears to be an excerpt of a larger policy.

scarcely justifying the new policy; after all, the existing policy already made clear that the vestibule was off limits to petition circulators and addressed congestion by requiring them to "[r]emain outside of county buildings and not obstruct individuals as they enter and exit the building," and required "polite, courteous and professional" behavior by those circulators.  Hr'g Ex. 2.

Defendants filed the transcript of the portion of the May 2, 2023, meeting of the Minnehaha County Commission where Anderson presented the LIMITED PUBLIC USE POLICY.  Doc. 28-1.  Anderson began by telling the Commission that "there was an existing policy for limited public use," misspeaking by adding the word "limited" to the prior Public Use Policy.  Compare Doc. 28-1 at 1 with Hr'g Ex. 1 at 1 and Hr'g Ex. 2.  After summarizing the proposed change to designate two rectangular areas away from entrance doors for political activity, Anderson assured the Commission that she "worked with facilities and also with state's attorney to make sure that this is doable."  Doc. 28-1 at 3.  In response to a question from Commissioner Karsky, Anderson said correctly that "there isn't any boundary [under the then-existing policy], except that they're not supposed to come inside" but then immediately added "and even that's not clearly stated."  Anderson repeated this apparent misapprehension later to the Commission.  Doc. 28-1 at 10 ("[I]n the previous policy, it stated in the case of severe weather those collecting signature may stand inside the entryway if they do not impede those entering and exiting.").[7]  The commissioners appeared not to have the prior policy, which directed petition circulators to "[r]emain outside of county buildings and not obstruct individuals as they enter and exit the building" and restricted petition circulator entry into the building as follows: "In the case of severe weather, the

---

[7] Perhaps there had been some Commission Administrative Office decision to allow petition circulators to enter the vestibule to avoid severe weather about which Anderson was aware, but there was no testimony at the evidentiary hearing to that effect and the old Public Use Policy reasonably reads to require permission of the Commission Administrative Office to do so.

Commission Administrative Office may allow individuals collecting signatures to stand inside the Administration Building entry-way if they do not impede those entering and leaving the building." Hr'g Ex. 2. Anderson described the primary focus of the policy change by stating: "The thing that we wanted to address the firmest is that they cannot come inside the building and stand where the doors are to get the signatures and block the sidewalk." Doc. 28-1 at 5. After talking about accessibility of wheelchair users into the building, Anderson said "So we need to make the building as accessible as possible without having three or four people standing right by the door, grabbing people as they come in and out." Doc. 28-1 at 5. Anderson said that she thought citizens did not appreciate passing by petition circulators. Id.

No member of the public spoke for or against the LIMITED PUBLIC USE POLICY. Doc. 28-1. Plaintiffs received no notice that any such policy was being considered and would have objected to the new policy if they had received notice. Of course, Defendants were not duty bound to notify Plaintiffs in advance of consideration of such a policy change.

The Minnehaha County Commission then unanimously approved on May 2, 2023, the new "LIMITED PUBLIC USE POLICY," which reads:

> Minnehaha County buildings exist to accommodate the business of county government, the courts, and the citizens of Minnehaha County. As such all buildings, adjacent grounds, sidewalks and parking facilities are nonpublic forums. While Minnehaha County appreciates those citizens who wish to take an active role in federal, state and local government decisions, county buildings must accommodate many people every day without any unnecessary delay or inconvenience.
>
> In an effort to preserve public safety and provide citizens the opportunity to conduct their county business without unnecessary disruption or inconvenience while at the same time provide for locations from which individuals or groups ("Utilizers") may circulate petitions, distribute information, and engage in other first amendment activities ("Political Activity"), the Minnehaha County Commission has approved the following "Limited Public Use Policy."

Utilizers may only use specifically designated areas at select facilities on the Minnehaha County campus to conduct Political Activity. The select facilities are defined as the Minnehaha County Courthouse and the Minnehaha County Administration Building.

AREAS WHERE POLITICAL ACTIVITY IS PERMITTED

<u>Minnehaha County Courthouse</u>

Outside:      Political Activity is allowed on the south sidewalk below the main entrance doors as specifically depicted on the attached color-coded map.

<u>Minnehaha County Administration Building</u>

Outside:      Political Activity is allowed in the area described as that portion of the Administration Building parking lot located approximately twenty-five feet (25')[8] west of the main entrance doors[9] as specifically depicted on the attached color-coded map.

Collectively these areas are hereinafter referred to as the "Designated Areas."

CONDUCT DURING POLITICAL ACTIVITY

1. Due to limited space and safety concerns within the Designated Areas, all Utilizers must check-in at the Minnehaha County Auditor's office prior to conducting any Political Activity on the Minnehaha County campus to permit the placement of safety markers and to verify space availability within the Designated Areas.
2. Utilizers using the Designated Areas must remain outside of county buildings and within the Designated Areas when conducting any Political Activity;
3. Utilizers may approach individuals for the purpose of asking them to sign a petition provided the Utilizers are within the Designated Areas;
4. Utilizers shall not, at any time, prevent access to county buildings or obstruct vehicular or pedestrian traffic within the parking area or as individuals enter or leave county buildings;

---

[8] Plaintiffs presented testimony that the "designated area" to the west of the Administration Building is actually 53.3 feet west of the main entrance doors. On inspection, the "designated area" outside the Administration Building is at least twice as far away as the 25 feet stated in the LIMITED PUBLIC USE POLICY. The designated area outside of the Administration Building appears to presently be used as parking for delivery vehicles—such as a Federal Express delivery vehicle when the undersigned visited. Vehicles turning into the parking lanes directly across from the west entrance tend to partially cross into the designated area when making such a turn.

[9] The "main entrance doors" referenced here constitute the west entrance to the Administration Building.

5. Utilizers must conduct themselves in a polite, courteous and professional manner including, but not limited to, respecting an individuals' right to decline to sign a petition;

6. Utilizers must respect the rights of other individuals utilizing the Designated Areas including, but not limited to, petition circulators and other individuals engaged in Political Activity;

7. Utilizers shall not follow any individual into any building or other area of the county campus where Political Activity is prohibited;

8. Utilizers shall not leave any material unattended within the Designated Areas, including without limitation: petitions, signs, banners, pamphlets, tables, and chairs;

9. Utilizers may seek refuge inside of the Administration Building in the event of severe weather provided that all Political Activity cease inside the Administration Building and such individuals do not impede those entering and leaving the building.

PLEASE NOTE: Pursuant to SDCL 12-18-3, all petition circulation and any other Political Activity must cease on the Minnehaha County campus during the period of absentee voting and on the day of the election as the County Administration Building is considered a polling place.

Note:  Any questions regarding this policy should be directed to the Auditor's Office (1st floor of the County Administration Building).

Hr'g Ex. 1 at 2–3.

Defendants presented in declarations and preliminary injunction hearing testimony that Anderson had additional grounds not contained in her memo or statements to the commission to justify the terms of the LIMITED PUBLIC USE POLICY. Defendants' witnesses generally acknowledge that there were few issues with petition circulators until four to six months ago.[10] The office manager of the State's Attorney's Office who has worked for 20 years in the Administration Building testified that, although her assigned parking is closer to the south entrance, in nicer weather she walks the extra distance to use the west entrance. In past years, petition circulators at the west entrance were polite and respectful and never blocked the door; they

---

[10] One of Defendants' witnesses mentioned chatter through the years from county employees who disliked petition circulating generally but was among those identifying behavior changes with petition circulators beginning last fall.

simply asked if she was a registered voter and if she wanted to sign whatever petition they had. She observed that in the last six months petition circulators have become more persistent where a simple "no thank you" no longer suffices. She described one incident where a tall, local political gadfly[11] (with a petition the content of which she did not recall) invaded her personal space by getting within four feet of her such that she could feel his breath and following her to her car while making an unwelcome and somewhat creepy comment about how she looked like Senator Kyrsten Sinema of Arizona.

The subject matter of the petition that Dakotans for Health began circulating some months ago matters in understanding the testimony of the next two defense witnesses. Plaintiffs are seeking to place on the ballot, as mentioned above and as they put it, a measure whereby South Dakotans "could choose to restore their Roe v. Wade rights." A ballot question committee named Life Defense Fund has formed to oppose "measures to legalize abortion in South Dakota." Hr'g Ex. 9. The person listed as Chair of the Life Defense Fund wrote about frustrating Dakotans for Health's efforts as follows: "Beginning this November [of 2022], we must stand next to their petition circulators, explain to the public how radical this amendment is, and encourage our fellow citizens not to sign the petition." Hr'g Ex. 10. Accordingly, for the first time in any witness's recollection, petition circulators outside the Administration Building—at least those circulating the Roe v. Wade petition[12]—attract what one defense witness called "petition blockers," leading

---

[11] This individual, identified by name during the evidentiary hearing, unsuccessfully ran for Sioux Falls mayor in 2022 finishing last with 574 votes, which was 6,770 votes behind the next closest finisher and more than 21,000 votes behind the mayoral victor.

[12] This Court chooses to call this the "Roe v. Wade petition" rather than the "pro-choice" or "pro-abortion" petition, which is the lexicon of those favoring or opposing the initiative. The content of any petition being circulated must not and does not weigh in this Court's decision making or analysis.

to voters being exposed on site to differing views on perhaps the single most intractably divisive issue in the United States.

Dakotans for Health, in addition to admonitions to its circulators not to engage in debates with citizens, has written specifically to its circulators: "PRACTICE CIVILITY. Remember to channel the spirit of Dr. Martin Luther King Jr. and keep your cool if anti-choice activists try to bully and intimidate you." Hr'g Ex. 7 at 2. Notwithstanding that admonition, a hired petition circulator for Dakotans for Health quarreled with an anti-abortion petition blocker outside the Administration Building on February 28 and March 1, 2023. The incident prompted the Minnehaha County's Commission Assistant to write her first Surveillance Report in her seven years in the position about misbehavior of those associated with petition circulation. She wrote:

> Incident as of 2/28/23: Petition circulator & Blocker exchanged words. Court Security addressed expected behavior with them. Both parties wanted clarity on rights each have. [Petition circulator] has a 6' table along the wall [outside of west entrance] & south of the west middle Admin[istration Building] door with clip boards & leaflets (pro abortion).

Hr'g Ex. 109. The next day, she wrote in the same Report: "Incident 3/01/23: At approximately 12:55:07 p.m. [Petition Circulator] took Blocker's sign & leaflets (against abortion) and threw them in the construction dumpster south of the west middle Admin[istration Building] door while the Blocker was up at the commission office asking for clarity." Hr'g Ex. 109. The same court security officer, this time with the County's attorney, again spoke with the Dakotans for Health petition circulator[13] who left thereafter; Dakotans for Health became aware of this incident and chastised the circulator. There have been no similar confrontations since.

---

[13]This person was identified by name at the preliminary injunction hearing and is not Ringrose, whose petition circulating work presently is the ballot initiative to end the state sales tax on food.

The same circulator whose behavior prompted the Surveillance Report on other occasions had entered and remained in the vestibule area, and 12 to 24 times the Commission Assistant (who views security cameras) asked him to leave the vestibule.[14]   The Commission Assistant testified that, before May 2, paper-sized notices were posted on the exterior vestibule windows listing the restrictions on petition circulators, including that they were not to enter the vestibule.   The Commission Assistant, who had prior to her seven years in the position worked in the adjacent Public Safety Building in a different county position, acknowledged that circulators get a steady flow of individuals at the west doors to the Administration Building and that from her perspective the problems with petition circulators began last fall.

On March 2, 2023, the Commission Administrator received an email from an 18-year veteran of the Minnehaha County State's Attorney's Office complaining about a petition circulator asking her daily to sign a petition and someone there handing out papers encouraging her not to sign the petition.   Hr'g Ex. 108.   This employee testified that she uses the west entrance to the Administration Building because she is one of the county employees with reduced mobility authorized to park in that west lot.   Petition circulators outside that west entrance historically were polite, though that changed in the last few months.   This employee used crutches or a cane to ambulate on the snow and ice this past winter and disliked the congestion of petition circulators and blockers near the door and the question "Do you believe in a woman's right to choose?"   She witnessed an occasion where the petition circulator and blocker got into a heated discussion as she was trying to enter the Administration Building.   This employee's March 2 email asked about whether the circulator and blocker could be moved away from the door.   Hr'g Ex. 108.   It is the

---

[14] Dakotans for Health disclaim knowing of this issue before Defendants responded to their motion.

only written complaint about petition circulators and blockers, though the Commission Administrator received other verbal complaints from employees and citizens.

Auditor Anderson was sworn in on March 6, 2023, becoming a county employee on that date. She had met with employees in advance and talked with the Commission Administrator about what the current policy was concerning petition circulation, receiving the Pennington County[15] policy from the Commission Administrator at that time. She saw petition circulators in the vestibule (as she can access security cameras) after she started and personally told them to step outside, having to do so twice with the same circulator whom the Commission Administrator had similarly instructed. She felt that the problem was an inability to hold anyone accountable. She testified that the LIMITED PUBLIC USE POLICY's "check-in" requirement simply was to allow for the placement of orange cones at the boundary of the "designated area" for traffic control and safety, lest orange cones be left out overnight when someone might swipe them.

Plaintiffs' counsel in cross-examining the Defendants' witnesses repeatedly pointed out that enforcement of the prior policy would have addressed all these complaints. After all, the prior policy required petition circulators to remain outside, to not obstruct individuals as they enter and exit the building, to conduct themselves in a polite, courteous, and professional manner, and to enter the vestibule only if allowed by the Commission Administrative Officer in case of severe weather. Hr'g Ex. 2.

---

[15] Pennington County contains South Dakota's second most populous city, Rapid City. The Pennington County policy does not have a petition circulator check-in component, but designates areas where signature gathering may occur. Doc. 28-2 at 1–2. Those areas are "near the main entrance doors" and at "the elevated entrance area outside the 2nd floor main entrance doors." Doc. 28-2 at 1, 3–4. The Pennington County policy also adopts a Code of Conduct for petition circulators. Doc. 28-1 at 1–2.

Defendants' new policy creates rectangular "designated areas" for political activities including petition circulating and blocking activity. Hr'g Ex. 1. The "designated area" outside the Administration Building is 53.3 feet outside of the west entrance to the building in an area of the parking lot, although oddly the policy presented to and passed by the Commission characterizes the designated area as only 25 feet outside those doors, which would be in the lanes of traffic. Hr'g Ex. 1. Instead of allowing petition circulators to be near the doors where they can engage in a conversation with those entering and exiting the building, the circulator will have to call out across lanes of travel and one row of parked cars,[16] from a distance of between 15 and 17 yards away, at people as they walk into the building or hope that someone parks close enough to the "designated area" that they might walk past them.[17] Plaintiffs note that the new policy puts about 99.3% of the outdoor space of the Minnehaha County campus off limits to petition circulators and requires them to stand in an area with no cover, fully exposed to the sun, rain, or snow. Plaintiffs likely would not mind that 99% of the Minnehaha County campus was placed off limits, as long as the remaining 1% was near enough to the west entrance to the Administration Building to allow for a conversation with those entering and exiting the building. The new policy plainly makes it much less likely that those entering or exiting the Minnehaha County buildings will engage at all with petition circulators. Ringrose, the circulator who has worked on ballot initiatives and candidate petitions since the 1990s outside of the Administration Building, testified that he would not bother

---

[16] There is a single space for law enforcement, a handicap-accessible spot, and a narrow walkway between those spots for access to the west entrance from the parking lot. The parking spots along the sidewalk extending to the west of the Administration Building appear to be 8'6'' x 18' striped areas for parking vertical to the sidewalk and the building.

[17] Those parking in the two rows in front of the west entrance likely would walk past, while those parking in rows farther north or south of the west entrance might not, crossing the lanes of travel nearer to where they parked and using the sidewalk on the west side of the building to access the west entrance. Those parking vertical to the west sidewalk would not cross paths with those in the designated area.

seeking to collect signatures from the "designated area" due to its distance from the door and the resulting inability to engage with voters in a conversational tone.

Plaintiffs also believe that the "designated area" in the parking lot leads to safety concerns because a petition circulator will have to try to entice someone across a moving lane of vehicles. Plaintiffs say that proximity to the building also provides shelter from the sun, wind, rain, and snow. Realistically, petition circulators receive protection next to the building from the sun only in the morning and from wind or precipitation only if there is a breeze out of the east, northeast, or southeast. Plaintiffs also contend that confining petition circulators and blockers in the same rectangle creates congestion of a different sort, but any such potential congestion likely exists currently in an area closer to the west entrance.

### III.   Preliminary Injunction Analysis

A court considering whether to enter a preliminary injunction evaluates "[1] the movant's likelihood of success on the merits, [2] the threat of irreparable harm to the movant, [3] the balance of the equities between the parties, and [4] whether an injunction is in the public interest." Powell v. Ryan, 855 F.3d 899, 902 (8th Cir. 2017) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). "No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue. However, in deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." Turtle Island Foods, SPC v. Thompson, 992 F.3d 694, 699 (8th Cir. 2021) (cleaned up and citations omitted).

### A.  The movant's likelihood of success on the merits

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I. Everyone agrees that the First Amendment applies to Plaintiffs' activity, and the Supreme Court has said that the Amendment's protection is "at its zenith" when "core

political speech" like petition circulation is involved.  U.S. Const. amend. I; <u>Buckley v. Am. Const.</u>

<u>L. Found.</u>, 525 U.S. 182, 186–87 (1999) (cleaned up and citation omitted)).  The question here is

how this protection applies when the petition circulation occurs on government property.  Like a

private property owner, the government "has the power to preserve the property under its control

for the use to which it is lawfully dedicated."  <u>United States v. Grace</u>, 461 U.S. 171, 178 (1983)

(cleaned up and citation omitted).  The First Amendment does not require the government to

"freely . . . grant access to all who wish to exercise their right to free speech on every type of

Government property without regard to the nature of the property or to the disruption that might

be caused by the speaker's activities."  <u>Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.</u>, 473

U.S. 788, 799–800 (1985).  Instead, the government's ability to limit free speech on its property

depends on the "nature of the" forum in which the free speech occurs.  <u>Id.</u> at 800; <u>Ball v. City of</u>

<u>Lincoln</u>, 870 F.3d 722, 729 (8th Cir. 2017).

      The government's authority to limit speech is at its lowest in traditional public fora like

public streets, parks, and sidewalks.  <u>See</u> <u>Grace</u>, 461 U.S. at 177 (noting that "streets, sidewalks,

and parks, are considered, without more, to be public forums" and that government authority to

restrict speech in these areas "is very limited") (cleaned up and citation omitted)); <u>Schenck v. Pro-</u>

<u>Choice Network of W. N.Y.</u>, 519 U.S. 357, 377 (1997) ("[S]peech in public areas is at its most

protected on public sidewalks, a prototypical example of a traditional public forum.").  The

government may impose reasonable time, place, and manner restrictions in public forums, but only

if those restrictions are content neutral,[18] "narrowly tailored to serve a significant governmental

---

[18] Defendants' new policy appears to be content-neutral.  Of course:

      Content-based laws—those that target speech based on its communicative
      content—are presumptively unconstitutional and may be justified only if the
      government proves that they are narrowly tailored to serve compelling state
      interests.  Courts will apply a strict scrutiny analysis when the regulation

interest," and "leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (cleaned up and citation omitted). This same test applies to designated public forums, which are created when the government "intentionally open[s] a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802; Pleasant Grove City v. Summum, 555 U.S. 460, 469–70 (2009) (explaining that the same standard governs restrictions on speech in public forums and designated public forums).

The government has more leeway to regulate speech in nonpublic fora, meaning "government property that is not by tradition or designation a forum for expressive activities by the public." Ball v. City of Lincoln, 870 F.3d 722, 730 (8th Cir. 2017) (cleaned up and citation omitted). Restrictions on speech in a nonpublic forum pass muster so long as they are "reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." Cornelius, 473 U.S. at 800 (cleaned up and citation omitted). These restrictions "'need not be the most reasonable or the only reasonable limitation' to be constitutionally permissible." Ball, 870 F.3d at 730 (quoting United States v. Kokinda, 497 U.S. 720, 730 (1990)).

Because the nature of the forum prescribes the level of constitutional protection, this Court begins by analyzing whether the sidewalk outside the Administration Building is a public or nonpublic forum.

### 1. The Administration Sidewalk is Likely a Public Forum

Public streets and sidewalks "occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate." McCullen v. Coakley,

---

discriminates on the basis of content, and a more lenient analysis to content-neutral regulations.
Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks, 864 F.3d 905, 913–14 (8th Cir. 2017) (cleaned up and citations omitted).

573 U.S. 464, 476 (2014) (cleaned up and citation omitted).  Public sidewalks are critical to the "exchange of ideas" because they provide access to people who might otherwise ignore the speaker's message.  Id.  Some sidewalks present easy questions concerning their forum status.  In Grace, for instance, the Supreme Court held that the sidewalks "comprising the outer boundaries" of the Supreme Court grounds were a public forum.  461 U.S. at 179.  These sidewalks were "indistinguishable from any other sidewalks in Washington, D.C.," and there was "no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave."  Id.  As such, the Supreme Court saw "no reason why [these sidewalks] should be treated any differently" than traditional sidewalks, which are "considered, generally without further inquiry, to be public forum property."  Id. at 179.

But not all sidewalks are easy to classify.  In United States v. Kokinda, 497 U.S. 720 (1990), the Supreme Court considered but did not resolve whether an interior sidewalk at a post office was a public forum.  Kokinda involved a regulation that prohibited "[s]oliciting alms and contributions" on a sidewalk that led from the parking lot to the front door of the post office.  Id. at 722–23, 727 (plurality opinion).  Justice O'Connor, writing for four members of the Court, explained that "the location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum."  Id. at 729.  She believed the sidewalk was not a public forum because it led "only from the parking area to the front door of the post office" and "was constructed solely to provide for the passage of individuals engaged in postal business." Id. Unlike a typical sidewalk, the postal sidewalk was not a "public passageway" built "to facilitate the daily commerce and life of the neighborhood or city."  Id. at 727–28.

Justice Kennedy concurred in the judgment that the regulation did not violate the First Amendment but did not join Justice O'Connor's decision that the postal sidewalk was not a public forum. Id. at 737–40 (Kenney, J., concurring). Noting the "wide range" of communicative activities the government allowed on the sidewalk, Justice Kennedy agreed there was a "powerful argument" that the sidewalk was "more than a nonpublic forum." Id. at 737. "If our public forum jurisprudence is to retain vitality," Justice Kennedy wrote, "we must recognize that certain objective characteristics of Government property and its customary use by the public may control the case." Id. at 737–38. Justice Kennedy joined in the judgment because he concluded that the regulation was an appropriate time, place, and manner restriction under the heightened standard that applied to public forums. Justice Kennedy viewed the regulation as narrowly tailored because it went "no further than to prohibit personal solicitations on postal property for the immediate payment of money," and still permitted people to "engage in political speech on topics of their choice, and to distribute literature soliciting support." Id. at 739. Justice Brennan, writing for the four remaining justices, concluded that the sidewalk was a public forum. Id. at 740–49 (Brennan, J., dissenting).

The Supreme Court has never established a test for determining whether a sidewalk is a public forum. Rather, courts make this decision on a case-by-case basis, with no one factor being determinative. The Eighth Circuit has directed courts to consider the (1) physical appearance and location of the property, (2) "traditional use of the property," (3) "objective use and purposes of the space," (4) "government intent and policy with respect to the property," and (5) "any special characteristics regarding the environment in which those areas exist." Powell v. Noble, 798 F.3d 690, 700 (8th Cir. 2015); accord Ball, 870 F.3d at 731; Bowman v. White, 444 F.3d 967, 977–78 (8th Cir. 2006).

The sidewalk running in front of the west side of the Administration Building looks just like the public sidewalks bordering the county campus; they share the same design, are made of the same material, and appear similar though the sidewalk actually widens by a foot or so as it wraps around the west entrance of the Administration Building.  Unlike the sidewalks in Kokinda and other cases Defendants cite, the sidewalk outside the west entrance is not physically separated from the surrounding public sidewalks.  See Kokinda, 497 U.S. at 727 (explaining that the sidewalk at issue "leads only from the parking area to the front door of the post office"); Monterey Cnty. Democratic Cent. Comm. v. U.S. Postal Serv., 812 F.2d 1194, 1197 (9th Cir. 1987) (explaining that the walkway was "separated from the municipal sidewalks by the Post Office parking area" and that the "isolated nature of the building and surrounding walkway indicate to all who approach" that the walkway "is not a thoroughfare for passersby intent on other errands"); Brown v. Ark. Dep't of Fin. & Admin., 180 F. Supp. 3d 602, 613–14 (W.D. Ark. 2016) (showing a picture of the sidewalk in question and noting that the property of the state revenue office was "completely separate" from the public sidewalk).  Rather, the sidewalk at issue connects with the public sidewalks on Minnesota Avenue and West 6th Street and runs unbroken from these points along the west side of the Administration Building.  The sidewalk is not exactly like the sidewalk in Grace, where the public had "no indication whatever" that they had entered a special enclave.  461 U.S. at 179.  A person on the sidewalk outside of the west entrance to the Administration Building would know that they are on a governmental entity's campus.  Still, the sidewalk's connection with the public sidewalks makes it decidedly different from the sort of isolated, free-standing sidewalks courts have found to be nonpublic forums.

Defendants argue that the "traditional and objective use" of the sidewalk outside the west entrance is to "assist patrons and employees to access the [Administration Building], both from

their vehicles in the parking lot and from the cross-thoroughfare on 6th Street." Doc. 23 at 14. Although facilitating access to the Administration Building is certainly one use of the sidewalk, it's not the only one. Petition circulators have for many years used the sidewalk to request signatures from people entering and exiting the Administration Building. The Defendants recognized this themselves in their prior policy, stating that "Minnehaha County buildings, particularly the Administration Building, have traditionally been popular locations for citizens collecting signatures for ballot petitions." Beyond that, government property can be a public forum even though it was not built for the purpose of expressive activity. Warren v. Fairfax Cnty., 196 F.3d 186, 195 (4th Cir. 1999) (en banc) (explaining "the primary purpose for which a particular piece of property was created is not dispositive," and noting Justice Kennedy's observation that "the traditional public fora of streets, sidewalks, and parks are not primarily designed for expressive purposes"); Bowman, 444 F.3d at 975 (explaining that a traditional public forum has, among other things, "the objective use and purpose of open public access *or some other objective use and purpose inherently compatible with expressive conduct*" (emphasis added) (cleaned up and citation omitted)). Here, the longtime use of the sidewalk to gather petition signatures and the Defendants' recognition of this use suggests that the sidewalk is a public forum. See Kokinda, 497 U.S. at 737 (Kennedy, J., concurring) (explaining that "certain objective characteristics of Government property and its customary use by the public may control the case").

Defendants also point to the statement in the LIMITED PUBLIC USE POLICY that all sidewalks on the county campus are "nonpublic forums." Although that might be the Defendants' intent now, it does little to change the analysis. After all, the public use of the sidewalk outside the Administration Building did not change to prompt Defendants' addition of the word "LIMITED" to the prior Public Use Policy and deletion of the sentence recognizing the area as

"traditionally . . . popular locations for citizens collecting signatures for ballot petitions."  Indeed, the increased activity and issues with petition circulators and accompanying blockers is what prompted the policy change, not a diminishment of the traditional petition circulation activity.  The Defendants cannot just announce their intent to change the status of the sidewalk without regard to its nature and the public's use of it.  See Ark. Educ. Television Com'n v. Forbes, 523 U.S. 666, 678 (1998) ("[T]raditional public fora are open for expressive activity regardless of the government's intent.").

The last factor for this Court to consider—any special circumstances—also favors finding that the sidewalk is a public forum.  The sidewalk runs along the most used entrance[19] to the Administration Building, a building that houses the county auditor, treasurer, and register of deeds, the state's attorney office, the public advocate, and the Minnehaha County Commission itself, as well as links to the Courthouse with directions to those coming for jury duty on where to go.  Both the County Commission and the Planning Commission hold regular public meetings in the Commission Chambers on the third floor of the Administration Building.  The Administration Building thus houses both administrative and legislative activities.  Numerous courts have found that an area's proximity to a seat of legislative power suggests that the area is a public forum. Warren, 196 F.3d at 189–90 (finding that a large grassy mall outside of a county government complex was "part of a class of property which by history and tradition has been open and used for expressive activity" because it was "part of the outdoor grounds of a seat of legislative and/or executive power"); Pouillon v. City of Owosso, 206 F.3d 711, 716–17 (6th Cir. 2000) (stating that the steps of city hall are "a venue that seems in the highest degree linked, traditionally, with the

---

[19] The LIMITED PUBLIC USE POLICY even refers to the west entrance as "the main entrance doors."  Hr'g Ex. 1 at 2.

expression of opinion, comparable not to a courthouse but to a capitol building as a public forum" and finding that the steps were a public forum given the absence of evidence that the steps had "been traditionally restricted"); Kanelos v. Cnty. of Mohave, 893 F. Supp. 2d 1001, 1015–16 (D. Ariz. 2012) (concluding that county administration building's housing of legislative activities weighed in favor of finding that area leading from the parking lot to the building's entrance was a public forum); Bledsoe v. Ferry Cnty., 499 F. Supp. 3d 856, 865–66, 871 (E.D. Wash. 2020) (concluding that a sidewalk outside the entrance to a county commissioners' building was a public forum). And while the sidewalk's proximity to legislative activities in the Administration Building might not be enough by itself to confer public forum status, it makes this case different from San Antonio Firefighters Ass'n Local 624 v. City of San Antonio, 404 F. Supp. 3d 1045 (W.D. Tex. 2019), a case on which Defendants rely involving public library sidewalks.

This Court finds, at least preliminarily, that the sidewalk running in front of the west entrance to the Administration Building is a traditional public forum given the sidewalk's connection with what indisputably is a public sidewalk, the sidewalk's long history of being used for petition circulation, Defendants' recognition of this long history in the Public Use Policy before May 2, 2023, and the sidewalk's proximity to county legislative activity.

## 2. The LIMITED PUBLIC USE POLICY is Not Narrowly Tailored

The west entrance sidewalk's preliminary status as a public forum means that the LIMITED PUBLIC USE POLICY must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." Ward 491 U.S. at 791 (cleaned up and citation omitted). The "narrow tailoring requirement means not only that the regulation must promote a substantial government interest that would be achieved less effectively absent the regulation, but also that the factual situation demonstrates a real need

for the government to act to protect its interests." Johnson v. Minneapolis Park & Recreation Bd., 729 F.3d 1094, 1099 (8th Cir. 2013) (cleaned up and citations omitted).  The protected interest cannot be abstract, and instead "there must be a genuine nexus between the regulation and the interest it seeks to serve." Id.

Defendants contend that the LIMITED PUBLIC USE POLICY promotes public safety and efficient access to the building and protects county employees from harassment.  They stress that "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Ward, 491 U.S. at 799 (cleaned up and citation omitted).  As the Supreme Court made clear in McCullen, however, the "government still may not regulate expression in such manner that a substantial portion of the burden on speech does not serve to advance its goals." 573 U.S. at 486 (cleaned up and citation omitted).

McCullen involved a Massachusetts statute that prohibited people from knowingly standing on a public walkway or sidewalk within 35 feet of an entrance or driveway to an abortion clinic.  Id. at 469.  The plaintiffs were anti-abortion advocates who engaged in "sidewalk counseling" by offering women approaching the clinics information about alternatives to abortion and trying to dissuade them from terminating their pregnancies.  Id. at 472–73.  The plaintiffs' sidewalk counseling strategy involved quiet, individualized conversations with the women, as they believed this approach was far more effective than more confrontational methods like yelling or waiving signs.  Id. at 473.  The plaintiffs claimed that the Massachusetts statute's creation of buffer zones around the clinics significantly hindered their ability to pass out literature and engage in face-to-face conversations.  Id. at 474.

The Supreme Court held that the statute was not narrowly tailored because it burdened substantially more speech than was necessary to further Massachusetts' legitimate interest in "public safety, patient access to healthcare, and the unobstructed use of public sidewalks." Id. at 486. The statute's main failure, the Court explained, was its significant burden on the plaintiffs' sidewalk counseling:

> [T]he buffer zones impose serious burdens on petitioners' speech. At each of the three Planned Parenthood clinics where petitioners attempt to counsel patients, the zones carve out a significant portion of the adjacent public sidewalks, pushing petitioners well back from the clinics' entrances and driveways. The zones thereby compromise petitioners' ability to initiate the close, personal conversations that they deem essential to "sidewalk counseling."

Id. at 487. These buffer zones likewise "made it substantially more difficult for petitioners to distribute literature to arriving patients." Id. at 488. The Court rejected Massachusetts' attempt to downplay these burdens, explaining that the government "imposes an especially significant First Amendment burden" when it frustrates methods of communication like leafleting and personal conversations. Id. at 489.

As for the narrowly tailored analysis, the Court concluded that Massachusetts "too readily for[went] options that could have" accomplished its interests without substantially burdening the plaintiffs' speech. Id. at 490. The Court noted multiple less burdensome alternatives, including another statute that already criminalized much of the conduct Massachusetts sought to prevent, statutes from other jurisdictions, and the enforcement of existing local ordinances. Id. at 490–94. It was "not enough," the Court explained, that the buffer zones would have made it easier to accomplish the state's goals. Id at 495. Rather, the state needed to "demonstrate that alternative measures that burdened substantially less speech would fail to achieve the government's interests."

Id.; see also id. ("A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency.").

Like the statute in McCullen, the LIMITED PUBLIC USE POLICY imposes serious burdens on Plaintiffs' speech. Plaintiffs presented evidence that to be effective, petition circulators need to be in a high-traffic pedestrian area, close enough to have a personal conversation with voters in a calm, inviting tone. Plaintiffs believe that this approach is more effective than shouting at people from a distance, and that the area near the doors to the west entrance is the best place from which to engage in their chosen manner of speech. Under the LIMITED PUBLIC USE POLICY, however, petition circulators are displaced to a "Designated Area" over fifty feet from the west entrance to the Administration Building. A petition circulator seeking signatures from the designated area would either need to call out across a lane of travel and one row of parked cars to people walking into the building or hope that people park close enough to the designated area that they might walk past them. In short, the new policy makes it much less likely that voters using the west entrance will engage at all with petition circulators. Indeed, Ringrose, a longtime petition circulator who believed that the west entrance was the best place to gather signatures, testified that he would not bother trying to collect signatures from the designated area because of its distance from the door and the resulting inability to speak with voters in a conversational tone.

Defendants argue that the First Amendment does not require that Plaintiffs be given the most advantageous spot to collect signatures and that Plaintiffs can still disseminate their message from the designated areas and the public sidewalks surrounding the county campus. This argument gives too little weight to the burdens the LIMITED PUBLIC USE POLICY imposes. "In the context of petition campaigns, [the Supreme Court has] observed that 'one-on-one communication' is 'the most effective, fundamental, and perhaps economical avenue of political

discourse.'" McCullen, 573 U.S. at 488 (quoting Meyer v. Grant, 486 U.S. 414, 424 (1988)). "When the government makes it more difficult to engage in [this] mode of communication, it imposes an especially significant First Amendment burden." Id. at 489. The new policy effectively hamstrings the Plaintiffs' chosen method of communication by requiring them to call out to voters from a distance and making it easy for voters to avoid the designated area. See id. ("It is easier to ignore a strained voice or a waiving hand than a direct greeting or an outstretched arm.").

Requiring petition circulators to remain in the designated areas also burdens substantially more speech than necessary to achieve Defendants' interests in promoting public safety, efficient access to the Administration Building, and protecting county employees from harassment. As Plaintiffs note, simply enforcing the prior policy would address the Defendants' concern without imposing a significant burden on Plaintiffs' method of communication. After all, that policy required petition circulators to remain outside county buildings, avoid obstructing people entering and exiting the buildings, and to conduct themselves in a "polite, courteous and professional manner." Defendants could also convert, for instance, the one reserved law enforcement and adjacent handicap-accessible[20] parking spots just outside the west entrance into a designated area, as this would allow Plaintiffs to solicit signatures in a conversational tone while at the same time secure efficient access to the west entrance by removing them from that limited area of the sidewalk right outside the west doors. In short, Defendants could easily achieve their interests without restricting petition circulators to the designated areas over fifty feet from the west entrance

---

[20] The County readily could designate two other nearby spots to law enforcement and handicap-accessible parking.

doors.[21]   And while Defendants are neither required to adopt this Court's suggestions nor use the least restrictive means to achieve their interests, they cannot "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." McCullen, 573 U.S. at 486.  For the reasons stated, Plaintiffs are likely to succeed on the merits.

### B.  The threat of irreparable harm to the movant

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009).  "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 895 (8th Cir. 2013) (citation omitted).  The irreparable nature of the harm stemming from First Amendment violations is well-recognized.  Powell v. Noble, 798 F.3d 690, 702 (8th Cir. 2015) (quoting Marcus v. Pub. Television, 97 F.3d 1137, 1140 (8th Cir. 1996)) ("If [the Plaintiffs] are correct and their First Amendment rights have been violated, this constitutes an irreparable harm." (citation omitted)).  Plaintiffs have shown an immediate and irreparable harm in support of their motion for a preliminary injunction because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).

### C.  The balance of equities between the parties

---

[21] This Court, as explained in an earlier order, also has concerns about the vagueness and necessity of the "check-in" requirement of the LIMITED PUBLIC USE POLICY.  However, that issue need not be addressed as its only purpose according to Defendants was to allow for placement of safety cones around the designated area for safety purposes.  Nothing in this Opinion and Order forecloses a different narrowly tailored check-in requirement.

Plaintiffs have shown an irreparable harm as discussed above. There appears to be minimal harm to Defendants to require them to revert to the policy that they had in place before May 2, 2023, or to excise from the new policy the "designated areas" provision and the "check-in" prescreening with the Auditor. On the one hand, Plaintiffs face possible interruption of their First Amendment rights; on the other hand, entry of a preliminary injunction requires Defendants and their employees to endure the nuisance of petition circulators and blockers near the exterior doors on the west side of the Administration Building, which can be mitigated by better enforcement of the prior Public Use Policy, or alternatively devising a narrowly tailored policy that passes constitutional muster. The County can still impose the prior policy's requirements of civility, staying out of the vestibule, and not obstructing ingress or egress to the Administration Building, as well as aspects of the LIMITED PUBLIC USE POLICY not subject to this preliminary injunction. The balance of equities or balance of harms analysis favors Plaintiffs.

### D. Whether an injunction is in the public interest

When a governmental agency is the defendant, "the final two factors [i.e. the balance of equities between the parties and whether an injunction is in the public interest] can 'merge' into one." Noem v. Haaland, 542 F. Supp. 3d 898, 925 (D.S.D. 2021) (cleaned up and citation omitted); see also Nken v. Holder, 556 U.S. 418, 435 (2009) (stating the same). "Generally, if a party shows a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are deemed to be satisfied." Rodgers v. Bryant, 942 F. 3d 451, 456 (8th Cir. 2019) (cleaned up and citation omitted). Plaintiffs have shown a likely violation of their First Amendment rights, and the public interest is served by protecting these rights. Kireby v. Furness, 52 F.3d 772, 775 (8th Cir. 1995) ("[T]he public interest, as reflected in the principles of the First Amendment, is served by free expression on issues of public concern."). The public also has an

interest to enter and leave county buildings without undue traffic flow problems that overly aggressive petition circulators or those protesting those petitions might create, but enforcement of the prior policy should blunt such behavior by petition circulators.  As stated earlier, Defendants also can enforce aspects of the LIMITED PUBLIC USE POLICY not being enjoined or develop a different policy that passes constitutional muster if they wish.

### E.  Bond

Under Rule 65(c), a preliminary injunction should issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The preliminary injunction sought by Plaintiffs does not cause Defendants to incur "costs and damages" apart from the costs of defending this suit generally, which do not increase through entry of a preliminary injunction.  The bond requirement may properly be waived in public interest litigation.  Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1043 (8th Cir. 2018).  Defendants have raised no issue with waiver of the bond requirement.

### IV. Conclusion and Preliminary Injunction

For the reasons explained, it is

ORDERED that this Court grants Plaintiffs' motion for a preliminary injunction to restrain Defendants, during the pendency of this case and unless this Court rules otherwise, from enforcing any part of the LIMITED PUBLIC USE POLICY adopted May 2, 2023, that requires "check-in" with the Minnehaha County Auditor by petition circulators or restricts petition circulators to "designated areas."  Defendants may enforce other provisions of the LIMITED PUBLIC USE POLICY and the prior Public Use Policy.  It is further

ORDERED that the bond requirement is waived.

DATED __13th__ day of June, 2023.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE